[Crim. No. 983. First Appellate District, Division One.—March 9, 1922.]

## THE PEOPLE, Respondent, v. THOMAS BRADY, Appellant.

[1] CRIMINAL LAW — ASSAULT WITH INTENT TO COMMIT RAPE — EVIDENCE—IMPEACHMENT OF PROSECUTRIX.—In this prosecution on a charge of assault with intent to commit rape, the court committed error prejudicial to the substantial rights of the defendant in refusing to allow the defendant the right to pursue a course of cross-examination of the prosecutrix, whereby it was sought to impeach her testimony by showing that she had previously made statements inconsistent with and contradictory to the testimony she· was then giving, and by withholding from the jury, and from the defendant, certain knowledge possessed by the trial judge to the effect that the prosecutrix had made statements to an officer of the law flatly contradicting the testimony she was then giving, which, if true, would tend strongly to discredit her as a witness in the case.

[2] ID.—IMPEACHMENT OF WITNESS—CONTRADICTORY STATEMENT—ERRONEOUS RESTRICTION OF EXAMINATION.—Before a witness may be impeached on account of having made contradictory statements, the attention of the witness must not only be called to the time and

---

1. Impeachment of witnesses by proof of prior inconsistent statements, note, 73 Am. Dec. 762.

place, and the persons, in the presence of whom, the contradictory statement is claimed to have been made, but the statement itself must be related to the witness, and it is error after permitting the attention of the witness to be called to the time, place, and persons present, to refuse permission to call attention to the statement itself merely because the witness states that she does not remember the occasion.

[3] ID.—FALSE TESTIMONY — KNOWLEDGE OBTAINED FROM RELIABLE SOURCE—DUTY OF JUDGE.—Where a defendant is charged with a dastardly offense not because it is claimed that he directly committed it but because of his association with those who did commit it, and the trial judge learns from a source he firmly believes to be reliable that the chief witness for the prosecution has admitted that she lied in material parts of her testimony, it is his duty, in the interest of justice and of fair dealing with the defendant, to cross-examine the witness thoroughly as to the admission or allow the defendant to take up the cross-examination so that the true situation as the judge knows it to be may be placed before the jury.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a motion for a new trial. Louis H. Ward, Judge. Reversed.

The facts are stated in the opinion of the court.

William F. Herron for Appellant.

U. S. Webb, Attorney-General, John H. Riordan, Deputy Attorney-General, Matthew Brady, District Attorney, and Stanislaus A. Riley, Assistant District Attorney, for Respondent.

KNIGHT, J., pro tem.—The defendant, Thomas Brady, was convicted of an assault with intent to commit rape upon the person of one Jean Stanley. He has appealed from the judgment of conviction and from the order denying his motion for a new trial.

On the night of November 25, 1920, the prosecutrix, Jean Stanley, and a companion, Jessie Montgomery, were persuaded to enter a house at No. 1256½ Howard Street, San Francisco, where they were subjected to most brutal treatment and vile indignity. As a result of those outrages, four men were separately tried and convicted, and their con-

victions have recently been sustained on appeal. (*People* v. *Murphy,* 53 Cal. App. 474 [200 Pac. 484] ; *People* v. *Kruvosky,* 53 Cal. App. 744 [200 Pac. 831] ; *People* v. *MacDonald,* 53 Cal. App. 488 [200 Pac. 491] ; *People* v. *Carey,* 53 Cal. App. 742 [200 Pac. 835].)

It was held on those appeals that the evidence established a conspiracy, on the part of those involved, to engage in acts of sexual intercourse with these young women either with or without their consent, and that, therefore, each conspirator was deemed guilty of every such crime committed in the furtherance of the conspiracy by any of the conspirators. The opinions rendered in the Murphy, Mac-Donald, and Kruvosky cases, *supra,* set forth quite fully the circumstances attending the commission of the various crimes, and for that reason it will not be necessary to again review the evidence here. It is revealed by the record in this case that all of the brutal treatment inflicted upon these young women and the immoral practices to which they were subjected were actually committed by Murphy, Kruvosky, and MacDonald, and by a man named Boyd. Murphy and Kruvosky were prizefighters. Carey was convicted upon evidence showing that he was a party to the conspiracy, and that it was he who was primarily responsible for the presence of the young women in the house that night, and because, further, it was proved by the testimony of the Montgomery girl that after she had been rendered helpless by the other men Carey committed an act of sexual intercourse with her.

Brady was prosecuted upon a different theory. There is no claim made by the prosecution that he made an assault of any kind upon the prosecutrix. His conviction was sought and obtained upon the theory that he was a party to the conspiracy to ravish these young women, and that he did, in fact, aid, abet, and encourage the other conspirators in the numerous assaults made by them upon the prosecutrix. Brady was first charged with and tried for an alleged rape upon the Montgomery girl. The jury acquitted him. He was then charged with an assault with intent to commit rape upon the Stanley girl, and the jury disagreed. Upon a second trial he was convicted.

[1] Several points are urged by the defendant on this appeal, but we shall address ourselves only to the vital one

which in our opinion demands a reversal of the judgment upon the ground that the trial court committed error in a manner prejudicial to the substantial rights of the defendant, as the result of which he was prevented from having a fair trial. The point of reversal relates to the refusal of the trial court to allow the defendant the right to pursue a course of cross-examination of the prosecutrix, whereby it was sought to impeach her testimony by showing that she had previously made statements inconsistent with and contradictory to the testimony she was then giving, and by withholding from the jury, and from the defendant, certain knowledge possessed by the trial judge to the effect that the prosecutrix had made statements to an officer of the court flatly contradicting the testimony she was then giving, which, if true, would tend strongly to discredit her as a witness in the case.

The essential features upon which the conviction of Brady was obtained were that he was a party to the whispered conversation in the Stroller's Cafe, which conversation was afterward held on appeal in the other cases to be the foundation of the conspiracy; that he assisted that night in forcing the Montgomery girl to drink liquor; that he encouraged the young women victims to enter the Howard Street house, and afterward actually aided in separating them so that they might be separately attacked; that he refused to assist them when they were being cruelly beaten by Murphy and Kruvosky, and that instead of going to their assistance he stood there and "only laughed" at them.

All of these facts were established by the testimony of the two young women. The Stanley girl testified, however, that Brady made no indecent proposal to her that night, and there is no evidence to the effect that while efforts were being made by the other men to violate her that Brady knew anything about it. She further testified that after she had been struck by Kruvosky and Murphy while in the kitchen, in the presence of Brady, she was taken to another room by Carey and MacDonald, and that she did not afterward see Brady that night. It was subsequent to that time that all of the unsuccessful attacks were made to violate her by Murphy, Boyd, Kruvosky, and MacDonald, and which now constitute the crime of an assault with intent to commit rape for which Brady was convicted.

Brady denied that he was a party to the whispered con-versation in the Stroller's Cafe or to any conspiracy of any kind, and claims that he was much annoyed at the intrusion in the Stroller's Cafe of Kruvosky, Murphy, and Boyd, all of whom were more or less intoxicated, and that he did everything possible to get out of the place without causing a disturbance with them; that the subsequent actions of these three men in jumping into the automobile of Carey as it was being driven away from the Stroller's Cafe was against his will; that when the stop was made in front of the Howard Street house he did not know of the purpose of it, unless it was, as stated by Carey, to drop off the three men; that he had never been in the Howard Street house before, and that he consented to go in then with the rest of his party merely in response to an invitation to take a drink; that after they had entered the house he saw that the Montgomery girl was apparently becoming very friendly with Kruvosky and was proceeding voluntarily to get under the influence of liquor; that he tried to prevent her from doing both; that she finally followed Kruvosky out of the front room into the kitchen, and he went in after her to induce her to leave the place, but that when she entered the kitchen she started to sing and dance for the several strange men present, including Kruvosky, Murphy, and Boyd, and that while she was singing and dancing some one of the men shouted to her to take off her clothes; that he then saw there was going to be trouble, and he went back to the front room, where Carey and the Stanley girl had remained; that he said to them, "I am going to get out of here; I have asked that girl to go out in the machine and she is out there dancing for Kruvosky and that bunch and there is going to be trouble. I am going to leave." To which Carey replied, "If you will wait just a minute we will all go"; that just then there was a scream emanating from the Montgomery girl in the kitchen and Jean Stanley ran to the assistance of her companion, followed by Carey; that he, Brady, thereupon told Carey that he was going to get out, and that he went to the front door, and Carey said, "Just a minute and I will be with you"; that he waited at the front door for a few minutes and Carey then joined him and they both left the house, got into the machine and drove away. Brady also denied that he saw either of the

girls struck that night or that he at any time laughed at them.

The evidence shows without conflict that when Jean Stanley ran to the kitchen for the purpose of assisting the Montgomery girl and was struck by Kruvosky and by Murphy and then taken into an adjoining room by Carey, that the latter left shortly afterward and was not again seen by the Stanley girl that night. The only testimony tending to prove that either Brady or Carey remained upon the premises after the Stanley girl was taken into the adjoining room was that given by the Montgomery girl, who testified that later, when she found herself lying nude on the mattress in the front room, Brady was there with the others, and at that time had sexual intercourse with her. But bearing upon that testimony it should be stated that Brady was tried for rape on that charge and was acquitted. The Montgomery girl also testified that Carey looked in and said, "The cops are coming!" There was also the testimony of Jean Stanley to the effect that when she made her escape from the house that night there was a machine standing in front of the house that looked like Carey's machine.

From the evidence above narrated it will be seen that so far as Brady is concerned the record shows a sharp conflict between his testimony and that given by the two young women. The jury doubtless accepted the stories of the young women and rendered its verdict accordingly. That being so, it is plain that if the trial court erroneously excluded any evidence which may have tended to discredit either of the young women as witnesses it was prejudicial to the rights of this defendant, because it would follow as a natural sequence that if testimony of the young women was shown to be willfully false on any material point the jury would then have had the right to reject the entire testimony of such witnesses and its verdict may have been different.

This brings us to the ruling of the trial court curtailing the cross-examination of the prosecutrix, Jean Stanley, but in order to fully understand and discuss the point it will be necessary to advert first to a phase of the case which developed on the hearing of the motion for a new trial. The first trial of Brady on this charge, which, as before stated, resulted in a disagreement of the jury, ended on

January 29, 1921. His next trial on this charge commenced
on January 31, 1921, and on February 5, 1921, the jury
brought in a verdict of guilty. During all of the trials
of this and the other defendants the young women in ques-
tion were by the order of the trial judge placed in the cus-
tody of Mrs. Kate O'Connor, a member of the San Francisco
Police Department. On the hearing of the motion for a new
trial Kate O'Connor testified that on the night of December
24, 1920 (that was prior to any of the Brady trials), she
had a conversation with Jean Stanley, in which it was
said: "I said, 'Jean, what's bothering you?' She said,
'Mrs. O'Connor, I haven't slept for two nights.' She said,
'I am worried to death.' I said, 'Well, what's wrong?'
and she didn't answer me directly. I kept on asking her
and she said to me, 'Well, I lied in the Kruvosky case;
so did Jessie.' She said, 'I lied to save Jessie's character.'
She said, 'Jessie went willingly into the bathroom with
Kruvosky; she also drank that evening.' . . . She said that
evening when they were in the Stroller's Cafe that Jessie
had sat on the chair with Kruvosky and that she had kissed
him and made love to him, that she had nothing more to do
with Mr. Brady; that when they were over to the house
at Howard Street that she had drank and got under the
influence of liquor; that she had her dresses . . . that she
was dancing, and had her dresses lifted above her knees;
that she was sitting on the mattress making love to Kru-
vosky before she went out into the kitchen; that Kruvosky
went out into the kitchen and that she followed him. . . .
She said that she had heard the scream and she went out
into the kitchen; that at that time Jessie was going into
the bathroom with Kruvosky; that she tried to stop her
going in, and Kruvosky told her Jessie was old enough to
know what she was doing, or old enough to know what she
was about; that she still tried to stop her; that Kruvosky
punched her in the nose when she tried; and that was really
the last that she had seen of Jessie that evening and that
time."

Mrs. O'Connor also testified at said hearing that she
immediately notified Captain Matheson, her superior officer,
and the trial judge of what the Stanley girl had said,
and that Captain Matheson had notified the district at-
torney's office, who immediately sent a representative to

interview the Stanley girl, but that no one so far as she knew had ever notified anyone connected with the defendant's side of the case. During the hearing of said motion the trial judge on several occasions stated that Mrs. O'Connor had informed him of these contradictory statements, and that he "knew all about it"; he further stated, "I have a lot of respect for Mrs. O'Connor. Anything she says I believe." In fact, it is shown by the record that he had that much confidence in the veracity of Mrs. O'Connor that when she was called upon to testify at the hearing of said motion he announced that she need not be sworn but that he would accept as the truth anything that she might say. However, at her own request, Mrs. O'Connor's testimony was taken under oath.

Now, reverting back to the last trial of Brady, and after Jean Stanley had been fully examined and cross-examined as a witness for the prosecution in its case in chief, but before the prosecution had rested its case, the trial judge, doubtless having in mind the information imparted to him by Mrs. O'Connor, asked that Miss Stanley be recalled as a witness and he then questioned the witness as follows:

"The Court: Q. Miss Stanley, in the testimony that you have given is there anything that you can think of that would be of benefit to this defendant that you have kept back? A. No, sir.

"Q. Is there anything that you have kept back that would be of benefit to the people? A. No, sir.

"Q. Have you told the whole truth about the matter, Miss Stanley? A. Why shouldn't I?

"Q. But have you? A. Why, certainly.

"Q. Is there anything that you can think of now that you have been mistaken about? A. No, sir.

"Q. Nothing that you want to correct? A. Not a thing.

"Q. Has anyone told you to make any statements in this case that was untrue? A. No, sir.

"The Court: That is all. Thank you."

Bearing in mind the expression of confidence by the trial judge in the truthfulness of Mrs. O'Connor, it must have occurred to him at the time the witness was giving this testimony that she was not telling the truth. Nevertheless he took no further steps to ascertain the truth or to lay before the jury the knowledge he then possessed in reference to

.the contradictory statements. On the contrary, as soon as the court had finished with its questioning and the defendant took up the examination of the witness for the purpose of further developing the matter of contradictory statements and for the purpose of laying a foundation for impeachment, the trial judge excluded, on the objection of the prosecution, the very line of examination which seemed certain to develop these contradictory statements. In this respect the record shows that the defendant asked the witness if she remembered a certain conversation held at a point on Kearny Street, between the Hall of Justice and the Sutter Hotel, on the night of January 6, 1921, the same night on which the jury in the first Brady trial (wherein he was charged with rape upon the Montgomery girl and acquitted) had retired, and before it had brought in its verdict, at which conversation were present herself, Miss Montgomery, Mrs. O'Connor, and a newspaper reporter, to which the witness replied that she did not remember. Thereupon the following proceedings took place:

"Mr. Herron: Just to refresh your recollection, was not this conversation in substance—

"The Court: Have you laid the foundation?

"Mr. Herron: Yes, the persons present, the time, and the place.

"Mr. Riley: And got the answer, that she doesn't remember the conversation.

"Mr. Herron: Well, I can go a little further.

"The Court: You cannot.

"Mr. Herron: And refresh her recollection.

"The Court: You cannot.

"Mr. Herron: I will reframe the question.

"The Court: You submit to me in writing the question you want to ask.

"Mr. Herron: May we let the witness step down, and may I ask—

"The Court: Yes, you may interview the witness off the stand, but you submit that question to me in writing. Step down, Miss Stanley.

"(The witness is thereupon excused) . . . (Counsel thereupon drafts question.)

"Mr. Herron: Do you want to see the question, Mr. Riley, before I pass it up to His Honor? (Handing draft to

counsel, who thereupon reads the same.) And I might also say, your Honor, that this question will be asked in the highest good faith and I believe I am prepared to prove that the statement was made. (Handing draft referred to to the court.)

"The Court: Let the record show a piece of paper, handed to the court and which was submitted to the district attorney, is handed to the reporter, and he is directed to make it a part of the record.

"Mr. Riley: And we object—

"The Court: That question will not be propounded in the presence of the jury— The objection, Mr. Riley?

"Mr. Riley: On the ground that it is incompetent, irrelevant, and immaterial, not proper cross-examination, not proper recross-examination, and in any event would call for the opinion and conclusion of the witness, and in nowise binding upon the people.

"The Court: Sustained. (Thereupon handing draft referred to to the reporter. The question referred to and ordered made a part of the record is in words as follows: 'Did you not say at that time and place that you hoped that Brady would be acquitted because he was innocent?')"

[2] The trial of every person charged with felony must take place in the presence of the jury. The jury is a coordinate part of the court. The purpose of the examination of the witness is to elicit the facts and the jury are the exclusive judges of those facts. There is no law requiring a defendant to propound his questions out of the hearing of the jury, but passing over this unwarranted direction of the court and taking up the matter of the propriety of the excluded question itself, it is clear to us that the question was a proper one and should have been put to and answered by the witness. It is too well established to admit of argument that before a witness may be impeached on account of having made contradictory statements, the attention of the witness, in all fairness to the witness, must not only be called to the time and place, and the persons, in the presence of whom, the contradictory statement is claimed to have been made, but the statement itself must be related to the witness so that full opportunity may be given the witness to admit or deny making such statement. Here the court allowed the defendant to call the attention of the witness

to the time, place, and persons present, and then merely because the witness stated that she did not remember the occasion refused to allow the defendant to pursue the matter further by calling the attention of the witness to the statement itself. It was impossible for the witness to either admit or deny making the statement unless the statement itself was first related to her. The question did not call for an opinion, as ruled by the court. It called for a fact, that is, the fact of whether or not the witness had made such a statement. The defendant was on trial for a crime which no one claimed he committed directly but whose conviction as above stated was sought upon the ground that he was a party to a conspiracy, in the furtherance of which an attack was made by others upon the prosecutrix. The impeachment question ruled out by the court was asked for the purpose of proving that the prosecutrix had declared to others that the defendant was innocent. If she had admitted making the statement certainly the jury would then have been entitled to know what she meant by it. That is, whether she meant by it that she had falsified her testimony when she stated that the defendant was a party to the whispered conversation, which formed the basis of the conspiracy, or whether she failed to tell the truth when she stated the defendant refused to respond to the call for assistance from herself and companion, or whether it was untrue as testified to by her that the defendant stood in the doorway, laughing at them, during their unforunate predicament, while in the kitchen of the Howard Street house. The truth of all of these elements was vital in determining the guilt of the defendant in view of the theory upon which he was tried.

On the other hand, if the witness had denied making the statement, the defendant would then have been in a position to contradict her by placing on the stand the other parties to the conversation, including Mrs. O'Connor, and the jury would then have been called upon to say which of them was telling the truth. It is only a fair inference to indulge in that if Mrs. O'Connor had been called to contradict the prosecutrix the whole mass of contradictory statements, which Mrs. O'Connor claims were made to her on the night of December 24, 1920, and of which the trial judge had full knowledge at the time of the examination

of the witness, would have been brought to the surface. By denying the defendant the right to cross-examine the prosecutrix on this important matter the defendant was deprived of the very key to the whole situation, which in all fairness should have been laid before the jury in order that the jury, as the sole judge of the credibility of the witnesses and other evidence in the case, might determine whether or not the prosecutrix had testified falsely as to material facts. If she had, it was the duty of the jury to treat all of her testimony with distrust and to reject it unless they believed that in other respects she had told the truth. Without the testimony of Jean Stanley, no case in law so far as the record discloses would have been established against the defendant. Her evidence was the very foundation upon which the whole structure of the prosecution rested, and under those circumstances it is our opinion that the trial court should have allowed the defendant a reasonable cross-examination in order to ascertain whether or not she was telling the truth.

[3] Moreover, the effect of the limitations placed upon the cross-examination of the prosecutrix appears to be all the more prejudicial to the rights of this defendant in view of the knowledge of the contradictory statements imparted to the trial judge by Mrs. O'Connor. We are not to be understood as stating it as the law that, when a trial judge hears public rumors or reads statements in public journals or learns through the medium of anonymous letters or the like that a witness in a criminal case has testified falsely, that he should take any cognizance of it. But, where, as in this case, a defendant is charged with a dastardly offense not because it is claimed he directly committed it but because of his association with those who did commit it, and the trial judge learns from a source he firmly believes to be reliable, in this case from a sworn officer of the law and of the court, in whose keeping the court had intrusted the protection of these girl victims, and in whose veracity the court had unlimited faith, that the chief witness for the prosecution has admitted that she lied in material parts of her testimony, it was his duty, in our opinion, in the interest of justice and of fair dealing with the defendant, to have gone into the cross-examination of the witness thoroughly, since he recalled the witness at all,

or else have allowed the defendant to take up the cross-examination of the witness where he had left off so that the true situation as he knew it to be might be placed before the jury. In no other way could the jury fairly and fully judge of the guilt of the defendant, and in no other way could the defendant be given a fair trial.

In conclusion, it may be stated that this was the fifth defendant and the seventh trial, on charges growing out of this moral outrage, to be brought before the trial judge who presided here. The evidence of the brutality and indignity visited upon these girls by Murphy, Kruvosky, MacDonald, and Boyd were such as to shock the sensibilities of the judge and of the community. Under such strained circumstances it is only consistent with human feelings that there should be a sincere desire to promptly and adequately impose the law's penalties upon those who have been the law's violators, but, even under those circumstances, the constitutional right of the accused to a fair and impartial trial is no different than in any other case, and where, as seems to be the situation here, public sentiment has been righteously aroused and there is an apparent inclination to condemn all persons connected with the affair before they have been tried, the courts should exercise the utmost care in seeing to it that the accused is accorded the full measure of his constitutional rights and that every opportunity recognized by the law is given him to prove his innocence.

In view of what has been said it is our opinion that the judgment and the order appealed from should be reversed, and it is so ordered.

Kerrigan, J., and Tyler, P. J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on April 8, 1922, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 8, 1922.

All the Justices concurred.

Waste, J., was absent and Richards, J., *pro tem.*, was acting.