[Crim. No. 7224. In Bank. June 13, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. DON M. MURPHY et al., Defendants and Appellants.

Harold Cutler, Gladys Towles Root and Eugene V. Mc-Pherson for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

SCHAUER, J.—Defendants Don M. Murphy and Dianna Kay Hargrove appeal from judgments of conviction entered upon jury verdicts finding each to be guilty of one count of pimping (Pen. Code, § 266h) and two counts of statutory rape (*id.*, § 261, subd. 1). Defendants were sentenced to state prison on all three counts.

Defendants' principal grounds of attack are that the trial court committed prejudicial error (1) in denying their motion for a continuance by reason of surprise when the People amended the information in an assertedly material respect on the morning of trial, and (2) in unduly restricting the exercise of their right to cross-examine the complaining witness in relation to matters vital to their defense. The record substantiates these contentions, and we have concluded that the judgments of conviction should be reversed.

The nature of defendants' contentions makes it necessary to summarize first the evidence taken at the preliminary examination. The materiality of that evidence in resolving the

issues on appeal will become readily apparent as the case develops.

The sole witness at the preliminary was Pamela Louise Laron, the 17-year-old complainant. She testified that in June 1960 a man named Al Le Tate introduced her to the defendants at the Seneca Apartments; that defendants proposed to her that she engage in prostitution for them; that she answered she "knew nothing about prostitution," but they said they would tell her what to do, where to go, and how much to charge. Miss Laron then told of committing five specific acts of prostitution assertedly arranged for her by defendants, and testified that she gave the receipts therefrom to defendants. The first act, she said, was committed with one Jim Prince at the Sunset Towers, for $100; the second with one Jim McDonald at the Beverly Hills Hotel, for $35. Miss Laron testified in detail as to the circumstances of each of these acts, relating how defendant Hargrove arranged the appointment, how one of the defendants drove her to and from the place of assignation, and how she paid over the proceeds to defendants. (As will hereinafter be more fully discussed, none of this testimony was true.) Miss Laron went on to testify that the three other asserted acts of prostitution were committed with men whose names she did not remember, but that each act took place at defendants' apartment where she lived for several weeks. On cross-examination Miss Laron at first denied but then admitted that she had worked as a prostitute *before* meeting these defendants.

By information defendants were charged in Count I with pimping and in Count II with pandering. Defendants' motion to dismiss (Pen. Code, § 995) was granted as to the latter count, and the People filed an amended information charging defendants in Count I with pimping and in Counts II and III with statutory rape. Count II charged that "on or about the 1st day of July, 1960" defendants did "aid and abet Jim Prince to have and accomplish an act of sexual intercourse with" Miss Laron, who was then 17 years old; Count III charged that "on or about the 3rd day of July, 1960" defendants did "aid and abet Jim McDonald" to commit the same crime with Miss Laron. Defendants entered pleas of not guilty to each count.

At the time the cause was called for trial, however, the district attorney moved to further amend the information by striking from Count II the name of Jim Prince and inserting

in lieu thereof the words "John Doe William," and by striking from Count III the name of Jim McDonald and inserting in lieu thereof the words "John Doe Bob." The amendment was allowed over defendants' strenuous protest, and defendants' motion for a continuance by reason of surprise was denied. The court ordered the trial to proceed forthwith—and it did—without even the procedural incident of an arraignment on the information as thus materially amended.

As well as having starred at the preliminary examination, Miss Laron was the People's principal witness at the trial. She testified that defendants were told she was 17 years old at the time she was introduced to them, but that defendants said "they were still going to try me" even though she was a minor; that they had her hair dyed platinum blonde and bought her some clothes "that made me look older and more presentable"; that defendant Hargrove (an admitted prostitute) then displayed her "trick book" containing listings of customers ("tricks") and told Miss Laron that she "was never to try to get a client of [her] own" but "must always work through them"; and that defendants provided her with room and board and spending money.

According to Miss Laron's trial testimony the first act of prostitution for defendants took place on July 14, 1960; however, it was not at the Sunset Towers for $100 but, rather, at the Statler Hilton Hotel for $25. In details substantially as elaborate, but by no means identical with those given at the preliminary hearing, Miss Laron testified that defendant Hargrove made the arrangements and told her to go to Room 39 of the Statler Hilton Hotel; that defendant Murphy drove her to the appointment; that she met the customer in Room 39 and that his first name was "William" but she could not remember his last name; that "William" paid her $25 after completion of the act; and that she was later met by defendant Murphy and gave him the $25. The witness then testified that shortly thereafter she committed three acts of prostitution arranged by defendants at the latter's apartment: i.e., with a young man named "Bob," with another young man whose name she could not remember, and with "a fat man," each of whom paid her $20 which she gave to defendant Hargrove.

On redirect examination Miss Laron admitted that at the preliminary examination she had become "confused" and had given untrue testimony in stating that she had met defendants in June 1960 (it was actually in the middle of July), had lived with them at the Seneca Apartments (it was actu-

ally at the Franklin Towers), and at their instigation had committed acts of prostitution with Jim Prince and Jim Mc-Donald; the latter acts, she acknowledged, were actually committed by her before she met these defendants.

Defendant Hargrove took the stand in her own behalf and denied the essential elements of Miss Laron's story; in particular, she denied arranging acts of prostitution for the latter, or taking the proceeds of any such acts. Defendant Hargrove testified that Miss Laron, who had run away from home, had been living with her (defendant Hargrove's) neighbors, Lisa and Dion Diamond; that the latter had a very small apartment, and as a favor to them she agreed to let Miss Laron move in for a few days until she could find herself a place to live; that Miss Laron stayed with her for about a week, then left for a while, then returned for a few days more. Defendant Hargrove testified that Miss Laron "was not with me continuously. She was there, maybe she would come in for one day and clean up, and put on some fresh clothing, and she would go out with her—she had several boy friends when she was with me, young men, and they would come by and pick her up. I never seen them, but I seen them pick her up in the car downstairs, and she would go out, and sometimes she wouldn't be back, and sometimes it would be half a day, sometimes a day, and sometimes longer." Defendant Hargrove also testified that she bought Miss Laron some inexpensive clothes, some makeup, and a new hairdo, but explained that Miss Laron had only one suit of clothes when she met defendants and "had been complaining about [the fact that] her hair looked terrible." The witness further acknowledged giving Miss Laron the name of her bail bondsman, as well as advice on personal hygiene, but explained that she did so because Miss Laron "was running around with" a number of men at the time and "told me she went to the beach and would pick up a man on the beach and go home and sleep with him. . . ."

Allen Harmon, security officer of the Statler Hilton Hotel, testified that there is no room number at the hotel corresponding to that given by Miss Laron (Room 39) as the site of her act of prostitution with "William" assertedly arranged by defendants.

The jury found defendants guilty on all three counts charged in the amended information. Not until that time does it appear to have been discovered that defendant Har-

grove was only 16 years old.[1] She was thereupon certified to the juvenile court (pursuant to Welf. & Inst. Code, § 825, now § 603), but that court found her "not a fit subject for consideration" under the Juvenile Court Law and remanded her to the superior court for further proceedings in the criminal action. Her motion for a new trial was denied, as was that of defendant Murphy. On the statutory rape counts the jury had recommended (pursuant to Pen. Code, § 264) imprisonment of each defendant in state prison rather than county jail. The jury, of course, had not known defendant Hargrove's true age; and the prosecuting attorney himself stated that "had I been aware of her age at the time of the trial, your Honor, in all probability I would not have recommended that the jury return a penalty as to state prison as to her." Nevertheless the court sentenced each defendant to state prison on all three counts; and when the court was requested to refer defendant Hargrove to the Youth Authority (as she qualified for such consideration under Welfare and Institutions Code section 1731.5), the motion was denied without comment.

 Defendants first contend that the trial court committed prejudicial error in denying their motion for a continuance by reason of surprise. It will be remembered that when the cause was called for trial the court allowed the People to amend the information by substituting the words "John Doe William" for the name of Jim Prince in Count II, and by

---

[1] The salient facts of Dianna Kay Hargrove's background as they appear in her probation report are, in summary, as follows: Dianna was born in Illinois on July 27, 1944, the fifth of six children. She never knew her father, as he was sent to Illinois State Prison for raping one of her older sisters. Her mother obtained a divorce and married a man named Stratton. When Dianna was 11 years old Stratton sexually molested her and was sent to jail. Thereafter the school authorities complained that Dianna was "associating with delinquents." As a result of this behavior, and still at the age of 11, she was turned over to a children's home by her mother. A year later she ran away, was recaptured, and was sent to a state reform school for girls. At the age of 13 she was released on parole to an older, married sister in Illinois, but again ran away and was returned to the reform school. A year later she was paroled to another married sister in Los Angeles; the latter was virtually a stranger, being in fact a half-sister who had been raised by relatives in another state. Within a few weeks Dianna ran away again, and lived in various furnished apartments in the Los Angeles area. At the time she met Miss Laron, therefore, Dianna was only 15 years old. After her conviction she admitted to the probation officer that she had concealed her true age (saying that she was 23), and explained that "Since she was on parole at that time she had been afraid that if they found out who she really was she would be returned to the Illinois Reformatory School until she was 21 years of age."

substituting the words "John Doe Bob" for the name of Jim McDonald in Count III. Defendants' counsel objected vigorously to the amendment, and argued that "This materially alters the entire nature of the prosecution's complaint, and I believe it entitles the defendant[s] to adequate time in which to prepare a defense to the amended information."

The point is well taken. Penal Code section 1009 provides in pertinent part that "The court in which an action is pending may order or permit an amendment of an . . . information . . . for any defect or insufficiency, at any stage of the proceedings, . . . The defendant shall be required to plead to such amendment or amended pleading forthwith, . . . and the trial or other proceeding shall continue as if the pleading had been originally filed as amended, *unless the substantial rights of the defendant would be prejudiced thereby, in which event a reasonable postponement, not longer than the ends of justice require, may be granted.*" (Italics added.)

■ While the determination of whether in any given case a continuance should be granted "normally rests in the discretion of the trial court" (*People* v. *Buckowski* (1951) 37 Cal.2d 629, 631 [2] [233 P.2d 912]), that discretion may not be exercised in such a manner as to deprive the defendant of a reasonable opportunity to prepare his defense.

■ "That counsel for a defendant has a right to reasonable opportunity to prepare for a trial is as fundamental as is the right to counsel." (*People* v. *Sarazzawski* (1945) 27 Cal.2d 7, 17 [14] [161 P.2d 934]; accord, *Cooper* v. *Superior Court* (1961) 55 Cal.2d 291, 302 [12] [359 P.2d 274].) It is also as fundamental as the defendant's right to be advised of the charges against him, for the latter right is illusory if he then is denied sufficient time to prepare to meet such charges. (See *In re Hess* (1955) 45 Cal.2d 171, 175 [6] [288 P.2d 5], and cases cited.)

■ In the case at bench defendants were denied a reasonable opportunity to prepare on Counts II and III. As those counts stood prior to the subject amendment defendants were charged with the crime of statutory rape "committed as follows," to wit, in that on specified dates defendants "did wilfully, unlawfully and feloniously aid and abet Jim Prince" (Count II) and "Jim McDonald" (Count III) to commit sexual intercourse with the complaining witness, Miss Laron. As set forth hereinabove, that witness' testimony at the preliminary examination described specifically and at length the

circumstances, time and place of each of the two acts assert-
edly committed with Jim Prince and Jim McDonald at de-
fendants' instigation. Defendants had the right to rely as
they did on that testimony in preparing their defense, for it
is settled that notice of the particular details of the crime
charged is given to the defendant by the transcript furnished
to him of the evidence upon which the accusatory pleading is
founded. (*People* v. *Crosby* (1962) 58 Cal.2d 713, 722-723
[7] [25 Cal.Rptr. 847, 375 P.2d 839] ; *People* v. *Roberts* (1953)
40 Cal.2d 483, 486 [3] [254 P.2d 501].) In the circum-
stances there is no merit in the People's argument that de-
fendants should not have been surprised because, the People
assert, each of the two acts of prostitution substituted by the
amendment for those originally charged was also mentioned
at some point in Miss Laron's testimony at the preliminary
examination. The mere mention at the preliminary of some
event not charged as an offense can scarcely be held to put a
person on notice that he must be prepared to instantly go to
trial on an information which substitutes the casually men-
tioned event for the offense which had been charged. In any
event, the transcript of the preliminary examination is devoid
of evidence to support the charge in Count II as thus amended
(aiding and abetting ''John Doe William'' to commit statu-
tory rape upon Miss Laron, who testified at the trial that the
act took place at the Statler Hilton Hotel) ; yet Penal Code
section 1009 is categorical in declaring that an information
''*cannot* be amended . . . so as to charge an offense not
shown by the evidence taken at the preliminary examination.''
(Italics added.) Manifestly the court erred in permitting the
novation as to Count II.

Here, as in *People* v. *Hembree* (1956) 143 Cal.App.2d 733,
743 [1] [299 P.2d 1043], ''It is to be remembered that it was
the deputy district attorney who, by reason of his unprepared-
ness on the original charge, caused the belated second
amended information to be filed and thereby created the situ-
ation which required further preparation by counsel for de-
fendant.'' It sufficiently appears, by contrast, that defendants
did use diligent effort to be prepared to defend against the
charges as they were set forth up to the moment the case was
called for trial: their counsel stated to the trial court that
''The defense in this case was materially based on the fact
that the District Attorney was alleging, by way of McDonald
and Prince, matters which he could not prove because they
were not true.

"Now if the District Attorney comes in and wishes to amend the names of the people whom this girl allegedly visited in these apartments—I haven't even consulted with the defendants on the nature of any other men, because my entire attention was directed at these two men and the defense I have prepared is based on that fact."

This is not a case, for example, where an amendment has been allowed to correct a clerical or typographical mistake in the spelling of a defendant's name (see, e.g., cases collected in *People* v. *Crosby* (1962), *supra*, 58 Cal.2d 713, 721 [3]), nor even a case where the prosecution (pursuant to Pen. Code, § 953) has inserted into the proceedings the true name of a defendant originally charged by a fictitious one; such corrections rarely if ever are a surprise to the defendant. Here the amendment did not relate to the names of the defendants themselves but to those of the particular third persons whom defendants were accused of aiding and abetting; and the latter names were not simply corrected or made more specific, but were stricken and replaced by wholly or partly fictitious names of apparently different persons. To properly prepare a defense to the charges as thus amended—which obviously allege different criminal acts—counsel for defendants might well have needed, for example, time to consult further with his clients, time to investigate the identities of "William" and "Bob," and time to produce additional evidence or interview additional witnesses for the purpose of establishing an alibi or laying the ground work for impeachment of the prosecution's testimony.[2]

In the premises this last-minute amendment of Counts II and III amounted to the filing of new charges against the defendants, and thus constituted an amendment not of form but of substance. ■ "It is clear that an amendment of substance to a complaint [or other accusatory pleading] will carry a corresponding obligation to allow the defense adequate time to prepare an 'amended defense.' " (*In re Newbern* (1960) 53 Cal.2d 786, 790 [2] [3 Cal.Rptr. 364, 350 P.2d 116].) ■ Defendants were required, nevertheless, to proceed to trial immediately, and hence their "substan-

---

[2]It is true that while the trial was in progress defendants' counsel managed to subpoena Allen Harmon, security officer of the Statler Hilton Hotel, and called him as an impeaching witness on the third day of testimony. But we cannot speculate that no other witnesses for the defense would have been discovered if counsel had had a reasonable time to investigate the matter.

tial rights'' have been ''prejudiced thereby'' (Pen. Code, § 1009). It follows that the court erred in refusing to grant a reasonable continuance at defendants' request, and that the error necessitates reversal of the judgments of conviction.[3]

Defendants next contend that the trial court committed prejudicial error in unduly restricting their cross-examination of Miss Laron, the complaining witness. In support, defendants point to a number of such instances in the record. To begin with, Miss Laron testified on direct examination that she had committed acts of prostitution before meeting these defendants; but when defendants' counsel sought on cross-examination to elicit the names of the persons involved in such acts an objection was interposed on the ground of immateriality. Defendants' counsel thereupon made the following offer of proof: ''Your Honor, a material ingredient to the defense of this case is the fact that this witness is completely mistaken, or, at least, if not mistaken, is not telling the truth in the story that she has told on the stand.

''To be specific, we are going to attempt to prove that the acts which she alleged took place with respect to these defendants actually were events that took place with regards to entirely different people.

''In order to be able to set up this defense and to establish the fact that she did carry on these activities, if they were carried on . . . with these other people, it is necessary to establish that she actually did work for them, what she did for them, and to show—and I think we can show that the exact dates at the exact times and places that she alleged took place with these defendants were events that took place with entirely different people. And the only way we can show this is to go back and have her describe her relations with these other people and when and under what circumstances, and then bring out to the jury and show that that is where these alleged acts took place and not with respect to these defendants. And it goes to the entire core of the defense of this case.''

---

[3]Defendants further contend that the court committed prejudicial error in failing to arraign them on the information as thus amended at the start of trial. Defendants, however, made no specific demand therefor or objection to this particular aspect of the procedure, and went to trial impliedly on their prior pleas of not guilty. In these circumstances ''[defendants'] substantial rights suffered no detriment by reason of the failure to repeat the plea'' (*People* v. *Walker* (1959) 170 Cal.App.2d 159, 164 [5-6] [338 P.2d 536]).

The court sustained the objection and excluded the testimony, commenting, "If I am wrong, the Appellate Court will say so." The record suggests that this attitude permeated the proceeding. And each time thereafter when defendants' counsel sought to cross-examine Miss Laron with respect to acts of prostitution committed by her while living with defendants but for persons other than the latter, objections were sustained on the ground of immateriality. We can understand that the trial court commendably was trying to exclude what it believed to be irrelevant details and to expedite the proceeding, but concern for such matters must not be so indulged as to impair the fairness of a defendant's trial. Wise advice for trial judges in criminal cases (and for prosecuting attorneys) was articulated long ago: "Questions as to the admissibility of evidence frequently arise, and in the hurry of a . . . trial the best Judge may err. . . . [W]henever the evidence proposed by the defense is not plainly inadmissible, it is better to let it go in, since, in nine cases out of ten, a single equivocal fact, of doubtful bearing upon the case, would have no effect upon the judgment of the jurors, who are usually disposed to pass . . . upon the general merits. . . . If the course here suggested were pursued by Prosecuting Attorneys, we are convinced that . . . the number of appeals . . . successfully prosecuted, would be greatly diminished." (*People* v. *Williams* (1861) 18 Cal. 187, 194-195; *People* v. *Graham* (1862) 21 Cal. 261, 268; *People* v. *Devine* (1872) 44 Cal. 452, 462.) ▮ In other words, trial judges in criminal cases should give a defendant the benefit of any reasonable doubt when passing on the admissibility of evidence as well as in determining its weight.

▮ Defendants' cross-examination of the complaining witness was restricted in still other ways. Miss Laron testified on direct examination that certain of the "tricks" that she "turned" (i.e., customers she entertained) for defendants came out of defendant Hargrove's own "trick book." On cross-examination Miss Laron volunteered the information that while living with defendants she "was sick one time," that a doctor was called, and "I don't know how much it was, but I did have a penicillin shot to make me feel better. I had a cold or something." Thereafter defendants' counsel sought on several occasions to inquire of Miss Laron whether that doctor had in fact treated her for a venereal disease, but in each instance objections were sustained on the ground of im-

materiality. Yet defendants' counsel offered to prove that the witness did have a venereal disease while living with defendants and that defendant Hargrove knew that fact, the implication being that in such circumstances it was highly improbable that defendant Hargrove would have used her own "trick book" as a source of customers for Miss Laron.

Finally, in giving on cross-examination her reasons for remembering (incorrectly, as she later admitted) the room number in the Statler Hilton where the act of prostitution with "William" assertedly took place, Miss Laron put forward a detailed story of being followed, accosted, and questioned by the hotel detective as she left the elevator on her way to the appointment. But when defendants' counsel asked her to describe the detective in question, an objection on the ground of immateriality was sustained over the protest of defendants' counsel that he had "a right to seek out the recollection of the witness to find out how accurate her memory is."[4]

A reading of the entire transcript is strongly convincing that these and other restrictions on the exercise of the defendants' right to cross-examine the complaining witness constituted prejudicial error. Penal Code section 686 provides in pertinent part that "In a criminal action the defendant is entitled: . . . 3. To . . . be confronted with the witnesses against him"; and it is clear that "The right of an accused to be confronted with witnesses is the right to have witnesses who testify do so in the presence of and *subject to cross-examination by* the defendant" (italics added) (*People* v. *Kiihoa* (1960) 53 Cal.2d 748, 752 [2] [3 Cal.Rptr. 1, 349 P.2d 673]). (See also Code Civ. Proc., § 2048, made applicable to criminal actions by Pen. Code, § 1102.) While the trial judge has broad discretion to control the ultimate scope of cross-examination designed to test the credibility or recollection of a witness (*People* v. *Burton* (1961) 55 Cal.2d 328, 343 [8] [11 Cal.Rptr. 65, 359 P.2d 433]), yet wherever pos-

[4]Defendants were equally frustrated in a later attempt to impeach Miss Laron on this aspect of her testimony by calling to the stand Allen Harmon, security officer of the Statler Hilton Hotel. Objections on the ground of immateriality were sustained to defendants' entire line of inquiry relating to the absence of any report by the hotel security officers of such an encounter as Miss Laron described. Yet defendants' counsel offered to prove that such reports were made in the ordinary course of business by the Statler Hilton detectives, the implication being that if no such report had been made on the asserted encounter with Miss Laron, it never took place.

sible that examination "should be given wide latitude, particularly in cases involving 'a witness against a defendant in a criminal prosecution' " (*People* v. *Watson* (1956) 46 Cal.2d 818, 827 [2] [299 P.2d 243]).

Not only is the case at bench a criminal action, it is one of that particular class of prosecutions—a charge of sex crime—where virtually the entire case for the People stands or falls with the credibility of the uncorroborated testimony of the female complaining witness. ■ It has long been recognized that "In this class of prosecutions the defendant, owing to natural instincts and laudable sentiments on the part of the jury, and the usual circumstances of isolation of the parties involved at the commission of the offense [whether real or fabricated], is, as a rule, so disproportionately at the mercy of the prosecutrix's evidence, that he should be given the full measure of every legal right in an endeavor to maintain his innocence." (*People* v. *Baldwin* (1897) 117 Cal. 244, 249 [49 P. 186].) In applying this rule, judgments of conviction have been reversed for abuse of discretion in unduly restricting the defendant's right to cross-examine or otherwise impeach the complaining witness in cases involving such offenses as rape (*People* v. *Hume* (1942) 56 Cal.App.2d 262, 266 [1] - 270 [4] [132 P.2d 52]; *People* v. *Higgins* (1937) 18 Cal.App.2d 595, 599 [3] [64 P.2d 454]; *People* v. *Flores* (1936) 15 Cal.App.2d 385, 401 [1, 2] [59 P.2d 517]), statutory rape (*People* v. *Pantages* (1931) 212 Cal. 237, 252-265 [8-13] [297 P. 890]; *People* v. *Howard* (1904) 143 Cal. 316, 320-322 [76 P. 1116]; *People* v. *Baldwin* (1897), *supra*, 117 Cal. 244, 249), assault with intent to commit rape (*People* v. *Brady* (1922) 56 Cal.App. 777, 779 [1] - 788 [2] [206 P. 668]), and violation of Penal Code section 288 (*People* v. *Hurlbut* (1958) 166 Cal.App.2d 334, 336 [1a] - 343 [1b] [333 P.2d 82, 75 A.L.R.2d 500]; *People* v. *Vaughan* (1933) 131 Cal.App. 265, 269-270 [2] [21 P.2d 438]).

■ Here the testimony which defendants sought to elicit from the complaining witness was, in the light of her performance on direct examination, not only material but even vital to the defense. While evidence of specific acts of misconduct is ordinarily inadmissible to impeach a witness (Code Civ. Proc., § 2051), that rule should have been relaxed in the case at bench, where the charge was procuring the complaining witness to commit acts of prostitution and that witness *admitted committing such acts for other persons* just prior to

meeting the defendants. As explained to the trial court in defendants' several offers of proof (quoted in part hereinabove), it was the theory of the defense that both prior to and during the period in question Miss Laron had worked as a prostitute for persons other than these defendants (e.g., for Lisa Diamond, defendant Hargrove's neighbor) and that the witness was mistaken in linking defendants to the charged acts of prostitution and pimping. Since these were matters largely within Miss Laron's own knowledge, it is evident that only by fully cross-examining her on the subject could defendants demonstrate the mistakes in her testimony. And it is equally evident that the jury were entitled to have the benefit of such an examination in assisting them to reach correct verdicts.

That there was an apparent basis in fact for the proposed defense is shown by such testimony as the following:

"Q. By Mr. Segal [counsel for defendants]: Did you [addressing Miss Laron] perform any tricks for Lisa [Diamond] during the time you lived there?

"The Court: Now you are talking about the two defendants, counsel?

"Mr. Segal: That's correct, your Honor.

"The Court: At what date?

"Mr. Segal: At the time that this witness was living with these defendants.

"The Court: Well, hasn't that been covered?

"Mr. Segal: Not this question hasn't been, your Honor. I'm asking now whether she performed tricks for Lisa, following up her last answer, by asking whether she has performed any tricks for Lisa while she was living with these defendants. That question has not been asked.

"The Court: All right, you can ask it.

"The Witness [Miss Laron]: *I don't know whether they were Lisa's tricks or not.* They could have been [defendant Hargrove's]. *I'm not sure.*

"Q. By Mr. Segal: So you don't know whose tricks you were actually performing, isn't that right, Pamela?

"A. When [defendant Hargrove] come up and told me I had a trick to perform—

"Q. Would you answer the question? . . .

"The Witness: *I'm not sure.*" (Italics added.)

Such uncertainty on the part of the complaining witness is reflected in the vagueness of much of the rest of her testimony and in the confusion demonstrated by (1) her admitted mis-

take in testifying at length at the preliminary examination that these defendants were involved in the Prince and McDonald incidents, (2) her admitted mistakes as to the date that she met defendants and the place where she lived with them, and (3) her impeachment on the details of the act of prostitution assertedly committed with ''William'' at the Statler Hilton Hotel. By contrast, the explanation given on the stand by defendant Hargrove appears straightforward and plausible, and was not shaken in any significant respect by the prosecution. After consideration of the entire record we are of the opinion that it is reasonably probable that a result more favorable to defendants would have been reached in the absence of these errors, and hence that the judgments of conviction must be reversed. (*People* v. *Watson* (1956), *supra,* 46 Cal.2d 818, 836 [12].)

Inasmuch as further contentions have been presented on this appeal which, although unnecessary to our judgment of reversal, may become material upon the going down of the remittitur, we consider them now. Defendant Hargrove questions the jurisdiction of the superior court to bring her to trial because of her age. The determination whether she is a fit subject for consideration under the Juvenile Court Law ''rests within the sound discretion of the juvenile court.'' (*People* v. *Yeager* (1961) 55 Cal.2d 374, 389 [12] [10 Cal.Rptr. 829, 359 P.2d 261].) But at the time the juvenile court made its finding of unfitness in the case at bench defendant Hargrove stood convicted of three counts of felony, a fact which may well have influenced the court in making such determination.[5] An unqualified reversal remands the cause for new trial and places the parties in the trial court in the same position as if the cause had never been tried. (*Hall* v. *Superior Court* (1955) 45 Cal.2d 377, 381 [2] [289 P.2d 431].) Accordingly, on remand (1) defendants will be entitled to have the superior court determine whether the uncertainties, mistakes, and apparent falsifications in the testimony of the People's principal witness are so gross, and material corroboration so lacking, as to require a dismissal of the action; and (2) if not, defendant Hargrove will be entitled to have the juvenile court redetermine, in the

---

[5]Former Welfare and Institutions Code section 834 provided for consideration by the juvenile court of ''the report of the probation officer, the prior record of the minor, his character, the type of offense, and such other factors as the court deems relevant. . . .''

light of our judgment of reversal and all other relevant factors, the important issue of whether she is a fit subject for consideration under the Juvenile Court Law.

For the reasons stated the judgments of conviction are reversed.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., Tobriner, J., and Peek, J., concurred.