Filed 8/17/21  P. v. Garbutt CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>MARCUS AARON GARBUTT,<br><br>     Defendant and Appellant. | B306555<br><br>(Los Angeles County<br>Super. Ct. No. BA482189) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert C. Vanderet, Judge.  Affirmed.

Rachael A. Robinson, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

A police sergeant who responded to a call about a bleeding man in Skid Row immediately located surveillance footage of two individuals beating the victim. After viewing the footage, the sergeant radioed descriptions of the individuals to other nearby officers. Appellant Marcus Garbutt, whose physical characteristics and clothing matched the description of one of the individuals in the video, was arrested around the corner from the scene. He was charged with robbery and assault by means of force likely to produce great bodily injury.

Prior to his jury trial, appellant filed a *Pitchess*[1] motion for discovery of the confidential personnel records of the police sergeant who viewed the surveillance footage and radioed the description. Appellant asserted that the sergeant lied about identifying him in the surveillance video. The superior court found that appellant had not shown good cause for the discovery and denied the motion.

After a jury was empaneled, the prosecutor advised the court and defense counsel that a police officer on her witness list had just disclosed that she had seen appellant in the area shortly before the assault. At that time, appellant was with a woman who matched the description of the other assailant; the same officer arrested appellant in the woman's presence after hearing the description over the radio. Appellant asked the court to exclude the evidence as late discovery. The court initially granted the request, but later admitted the evidence with a curative jury instruction. The court denied appellant's requests for a mistrial and a continuance. The jury found appellant guilty

_____

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

of attempted robbery and assault by means of force likely to produce bodily injury.

Appellant contends the court abused its discretion by denying his *Pitchess* motion and request for a continuance. We disagree and affirm.

## PROCEDURAL HISTORY

An information filed November 26, 2019[2] charged appellant with second degree robbery (Pen. Code, § 211)[3] and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)). The information further alleged that appellant personally inflicted great bodily injury on the victim during the commission of both offenses (§ 12022.7, subd. (a)), rendering them serious (§ 1192.7, subd. (c)(8)) and violent (§ 667.5, subd. (c)(8)) felonies. The information also alleged that appellant was released on bail or his own recognizance at the time of the offenses (§ 12022.1) and had suffered prior strike convictions (§§ 667, subds. (b)-(j), 1170.12).

A jury found appellant guilty of the lesser-included offense of attempted robbery (§§ 211, 664) and the charged assault offense (§ 245, subd. (a)(4)). It also found true the allegations that appellant personally inflicted great bodily injury on the victim. After a subsequent bench trial, the court found that appellant was on bail at the time of the offenses and suffered the prior convictions alleged in the information.

---

[2] The record indicates that a previous information was filed and dismissed, and the November 26, 2019 information was a refiling of the original charges. Neither the original information nor a transcript of any preliminary hearing that preceded it is in the record.

[3] All further statutory references are to the Penal Code unless otherwise indicated.

After denying appellant's *Romero*[4] motion to strike his prior strike offenses, the trial court sentenced him to a third-strike term of 25 years to life for the assault. The court sentenced appellant to a concurrent term of 25 years to life for the attempted robbery. Appellant timely appealed.

## FACTUAL BACKGROUND

At approximately 1:30 a.m. on July 12, 2019, someone called 911 to report "a man on the ground" bleeding extensively from his face at 5th and San Julian in downtown Los Angeles. Los Angeles Police Department (LAPD) Officers Davon McCoy and Mark Correa both testified that they responded to the area. They found a man lying in a pool of blood; photos of the scene taken by Correa's body-worn camera were admitted into evidence. Both officers testified that the victim was going in and out of consciousness. McCoy added that the man's nose was "misaligned" and his left eye and the surrounding area were swelling. McCoy called an ambulance.

While waiting for the ambulance to arrive, McCoy and Correa asked the victim what had happened. Body-worn camera video footage of the discussion was played for the jury and admitted into evidence. The victim said that "a male, Black" had come up to him and "just started swinging." He added, "And I know they did rob me." An unidentified woman standing nearby told the officers she had seen "a guy stomp [the victim's] head on the concrete." The woman was unsure if the assailant robbed the victim.

After the ambulance arrived, McCoy and Correa escorted the victim to Good Samaritan Hospital. By the time Correa

---

[4] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

returned to the police station later that day, appellant had been arrested in connection with the incident. Correa testified that he later performed a strip search of appellant at the jail, during which he removed black and red sneakers from appellant's feet. Correa testified that the sneakers, which were admitted into evidence, had "what appeared to be blood" on the "narrow grooves of the tread towards the toe and the ball of the feet." McCoy testified on cross-examination that he did not see any bloody footprints at the crime scene. Correa testified on cross-examination that the sneakers were never tested for blood.

LAPD sergeant Andrew Cullen testified that he responded to the crime scene in his capacity as a supervising officer. While the other officers were interviewing the victim and other people in the area, Cullen canvassed the area for surveillance cameras. He found one affixed to a nearby building, and the building's security guard immediately assisted him in "pulling video." Cullen estimated that he viewed the video approximately 15 minutes after the crime occurred.

Cullen testified that the video, which was played for the jury and admitted into evidence, showed three people: the victim, a person wearing a white shirt, and a person wearing a red hooded sweatshirt. The person in white placed his arms around the victim's neck while the person in red punched the victim and "rifl[ed] through" his pockets. The person in white released the victim and then punched him in the face. The victim fell to the ground, and the person in white kicked and then "stomped" on the victim's head. Cullen testified that after he viewed the video, he used his police radio to broadcast a description of the person in white. He described the person as "bald . . . [with] a close-cropped beard, white or gray in color, a white shirt, dark pants.

5

They're wearing tennis shoes that have like a red or bright-colored sole or strip [*sic*] on it."

Shortly after Cullen's broadcast, LAPD Officers Bolor and Emestica responded that they had detained a possible suspect. Cullen drove to their location, which was around the corner from the crime scene; he testified it took him about 30 seconds to drive there. He saw that Bolor and Emestica had detained appellant, whom Cullen identified in court. Cullen testified that appellant, like the assailant in the video, was bald, had a white beard, and was wearing a white t-shirt, dark pants, and tennis shoes with bright-colored soles. Cullen attempted to locate witnesses to conduct a field show-up, but no one was willing to participate. On recross-examination, Cullen admitted that he was unaware of any efforts to have the victim identify the assailants. To Cullen's knowledge, no money was found on appellant.

Officer Reiner Bolor testified that she and her partner, Officer Emestica, were patrolling Skid Row on foot on the night of July 11-12, 2019. From about 12:11 a.m. to 12:57 a.m. on July 12, they patrolled the "5th Street corridor" between Crocker and San Julian. During that patrol, Bolor encountered a woman wearing a red hoodie; appellant was with her. Bolor, who recognized the woman from earlier encounters, "made small talk" with the pair. Bolor's body-worn camera was not turned on at the time.

Later that night, "probably around 1:30 a.m.," Bolor heard a radio call about a possible suspect in an assault that had occurred in the area of 5th and San Julian: "a male African-American, white t-shirt, dark pants, and approximately 40 years old," wearing "bottom red" shoes. Bolor responded to 5th and San Julian and saw appellant for a second time that night. He was

6

around the corner from 5th and Julian, standing in the middle of the road outside 545 San Pedro Street. The woman from the earlier encounter was across the street from him. Bolor detained appellant because he matched the description she had heard. Bolor noticed that appellant was sweaty and having a hard time breathing. She allowed the woman from the earlier encounter—who was no longer wearing a red hoodie—to give appellant some water while he was detained.

## DISCUSSION

I. *Pitchess* Motion

    A. Background

Prior to trial, appellant filed a *Pitchess* motion seeking discovery of complaints concerning sergeant Cullen's "character[ ] for honesty and integrity," including accusations of "lying, filing false police reports, fabricating admissions, confessions or other evidence, perjury, theft, fraud, misrepresentation, or malfeasance," as well as "making false, misleading, or inaccurate statements (or committing any other dishonest misconduct, such as threatening or coercing or interfering with witnesses), orally, in writing, or in any other form, during an official, internal affairs or any other investigation conducted by the Investigating Department or any other agency."

Appellant's counsel filed an accompanying declaration in which she made the following relevant assertions:

"5. At the preliminary hearing, Sergeant Cullen testified that he watched surveillance footage of the offense and positively identified the defendant as the suspect involved.

"6. The defendant denies that he was involved in the incident and denies that he is depicted in the surveillance footage.

7

"7.     Specifically, I am informed and believe that the assertion by Sergeant Cullen as set out below is a lie.

"a.     *That he knows the defendant is depicted in the surveillance video.*

"8.     The Defense intends to raise the defense at trial that Sergeant Cullen lied about his identification of the defendant in the video because the defendant happened to be in the area of the crime.  To prove this, the defendant would use any evidence of prior instances of dishonesty or fabrication of evidence to impeach the officer when he testifies at trial."

The LAPD filed a written opposition to the *Pitchess* motion. It argued that appellant failed to establish a prima facie case of intentional misconduct by Cullen because he did not provide a "plausible alternative scenario that is possible and consistent with the events and observations of the witnesses."

At the hearing on the motion, the court summarized the facts as it understood them from the materials before it: "it appears that two other officers wrote a report and interviewed the complaining witness and the witness gave a description and subsequently a videotape was found and the sergeant is identifying your client as being the person on the tape."[5]  The court stated it was inclined to deny the motion because there was no "plausible alternative scenario put forth," and "the video probably speaks for itself."  It added, "I mean, he's either correct or incorrect. And if he's incorrect, he's either lying or mistaken. But how would you be able to distinguish whether or not he's mistaken or lying."  The court also noted that the police report,

---

[5] According to the testimony at trial, McCoy wrote the police report.

8

which is not in the appellate record, stated that appellant was found with a $50 bill in his possession and blood on his shoes.

Appellant's counsel explained that Cullen "relie[d] upon his own observations instead of interviewing witnesses to make the identification," and no independent witnesses identified appellant as the assailant. She further disputed the police report's claims that there was physical evidence linking appellant to the alleged robbery. The court concluded that appellant failed to put forth "a sufficient factual basis" or "alternative plausible scenario" and denied the motion without conducting an in camera hearing.

### B. Analysis

Appellant contends the court erred by denying his *Pitchess* motion. We review the trial court's ruling for abuse of discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.) A trial court abuses its discretion if its ruling exceeds the bounds of reason. (*People v. Galan* (2009) 178 Cal.App.4th 6, 12.)

*Pitchess*, *supra*, 11 Cal.3d at pp. 536-537, established that a criminal defendant may obtain discovery of certain relevant information in police personnel files by making general allegations establishing cause for the discovery and showing how this information supports a defense to the charges against him or her. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1018-1019 (*Warrick*).) "To initiate discovery, the defendant must file a motion supported by affidavits showing 'good cause for the discovery,' first by demonstrating the materiality of the information to the pending litigation, and second by 'stating upon reasonable belief' that the police agency has the records or information at issue." (*Id.* at p. 1019, quoting Evid. Code, § 1043, subd. (b)(3).) "This two-part showing of good cause is a 'relatively low threshold for discovery.' [Citation.]" (*Ibid.*) "If the trial court

9

finds good cause for the discovery, it reviews the pertinent documents in chambers and discloses only that information falling within the statutorily defined standards of relevance." (*Ibid.*)

At issue here is whether appellant made the requisite showing of good cause. To make that showing, counsel's declaration in support of a *Pitchess* motion "must propose a defense or defenses to the pending charges" and "articulate how the discovery sought may lead to relevant evidence or may itself be admissible direct or impeachment evidence [citations] that would support those proposed defenses." (*Warrick*, *supra*, 35 Cal.4th at p. 1024.) "Counsel's affidavit must also describe a factual scenario supporting the claimed officer misconduct." (*Ibid.*) The extent of the proffered factual scenario necessary depends on the circumstances of the case. In some cases, the factual scenario may consist of a mere denial of the facts in the police report. (*Id.* at pp. 1024-1025.) In other cases, where the motion and affidavit are accompanied by "witness statements, or other pertinent documents," the defendant "must present . . . a specific factual scenario of officer misconduct that is plausible when read in light of the pertinent documents." (*Id.* at p. 1025.) A "plausible scenario of officer misconduct is one that might or could have occurred." (*Id.* at p. 1026.) It is "both internally consistent and supports the defense proposed to the charges." (*Ibid.*) It need not be credible or persuasive, however. (*Ibid.*)

The court did not exceed the bounds of reason in concluding that appellant failed to show good cause. Appellant asserted that he was not depicted in the surveillance footage, but Cullen falsely identified appellant in the video because appellant happened to be in the vicinity shortly after the incident. Appellant made no

claim that either the victim who described an assailant or the officer who documented that description in the police report was lying. Nor did he dispute that he in fact matched the description. Moreover, the veracity of Cullen's identification was minimally material at best, as the surveillance video on which he relied was available and indeed was presented to the jury for an independent assessment. (See *People v. Mackreth* (2020) 58 Cal.App.5th 317, 341-342 [finding no good cause where defendant alleged officers used excessive force and incident was recorded on four videos].) "*Warrick* permits courts to apply common sense in determining what is plausible, and to make determinations based on a reasonable and realistic assessment of the facts and allegations." (*People v. Thompson* (2006) 141 Cal.App.4th 1312, 1318-1319.) The court appropriately did so here.

## II. Motion for Continuance

### A. Background

After the jury was empaneled but before opening statements were made, the prosecutor informed the court and appellant of the following. "During the lunch hour I spoke with officer Bolor, who is one of the witnesses who would be called to testify. She did not write a report in this case. She was a second responding officer. The statements that I gathered from her, I emailed to defense counsel over the lunch hour, and I provided a printed-out copy. The statement that I would want to have admitted would be that she was working starting July 11th at 5:00 p.m. At approximately 12:11 a.m. on July 12th, she began a foot beat in the area of San Pedro and 5th Streets. During that foot beat, she recognized a female who was with the defendant. She engaged in conversation with the two of them, or she had some sort of contact with them. That woman who she recognized,

11

she had had several conversations in the past and knows her because of how often she patrols the area. Later on after the assault occurred, officer Bolor detained the defendant, and - - because he matched the description that she was given over the radio. And while the defendant was detained, that same woman who was with him before the incident came out dressed differently and assisted with Mr. Garbutt because he had vomited and he needed some water. And she did not have body-worn video during the foot beat and she did not write a report."

Appellant's counsel objected on late discovery grounds. The court stated it was "disinclined to allow it," and the prosecutor responded that the court could instruct the jury on late discovery or restrict the scope of the testimony. The prosecutor also reiterated that this was the first time she had spoken to Bolor and learned of the information at issue. The court ruled that it was "not going to allow it," because "it's of marginal relevance and I don't find the curative instructions to be particularly effective."

Later, after McCoy and Cullen had testified, and the surveillance video of the attack had been played for the jury, the court notified counsel that it was "reconsidering" its ruling. The court then continued, "It's clearly of more than marginal relevance. I'll allow you to call that witness." Appellant's counsel objected and requested a mistrial or "additional time to deal with this [new] evidence." She explained, "There is new information that I could have investigated. I didn't even know that this officer was involved beyond booking my client until now. So there is much more I could have done with respect to this officer's testimony if I had known about this statement ahead of time. I know the People just received it, but that doesn't change the

12

position I am in." The court denied the request for mistrial and said it would consider instructing the jury on late discovery.

The following day, appellant's counsel filed a written motion for a continuance of "about two weeks." In her declaration in support of the motion, she stated that she needed additional time "to investigate the case and prepare the case for trial." Counsel stated that if granted a continuance, she would consult with an eyewitness identification expert to prepare a report and possibly testify; file a *Pitchess* motion seeking discovery on Bolor; obtain Bolor's body-worn camera footage from a recent arrest during which Bolor claimed to have again seen the woman in the red hoodie; and, based on counsel's information and belief that "Bolor is mixing up the individual in the video with another individual who Mr. Garbutt knows," contact the latter individual and "ask her to testify regarding her whereabouts at the time of the incident." Counsel further asserted that if she had received the information from Bolor earlier, she would have changed some of her trial tactics, including voir dire, opening statement, and cross-examinations of McCoy and Cullen.

The trial court orally denied the motion. It explained, "I don't think this is an issue on which additional time is really necessary, and that counsel isn't able to do a cross-examination with the additional day I gave." After appellant's counsel reminded the court that she had not in fact had a full day to investigate the information, the court said it understood but still believed "it's weighed against the inconvenience of having jurors come back. I don't think it's necessary. So it's denied."

Bolor took the stand and testified as summarized above. On cross-examination, appellant's counsel explored the delay in

13

Bolor's disclosure of her first interaction with appellant and the woman. She also highlighted several inconsistencies in Bolor's testimony. Over the prosecutor's objection, the court instructed the jury on late discovery with a modified version of CALCRIM No. 306. It read, "Both the People and the Defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the opportunity to produce all relevant evidence, to investigate and counter opposing evidence, and to receive a fair trial. In this case, the People failed to disclose to the Defense, within the legal time period, Officer Bolor's testimony regarding the identity of the individual in the red sweatshirt, and the fact that she observed the defendant in the area prior to the incident. In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure." Appellant's counsel reminded the jury about the late disclosure during her closing argument.

### B. Analysis

Appellant contends the court erred by denying his motion for continuance. Relying on *People v. Hughes* (2020) 50 Cal.App.5th 257 (*Hughes*) and *People v. Murphy* (1963) 59 Cal.2d 818 (*Murphy*), he argues that the lack of a continuance deprived him of a reasonable opportunity to respond to new evidence and therefore violated his due process and confrontation rights. He further contends the curative instruction the court provided was inadequate to cure the prejudice he suffered.

We review the trial court's denial of a continuance under the abuse of discretion standard. "The granting or denial of a motion for continuance in the midst of trial traditionally rests within the sound discretion of the trial judge who must consider

14

not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion." (*People v. Laursen* (1972) 8 Cal.3d 192, 204; see also *People v. Doolin* (2009) 45 Cal.4th 390, 450 (*Doolin*).) As a reviewing court we consider the circumstances of the case and the reasons presented for the request to determine whether the trial court's ruling was so arbitrary as to deny due process. (*Doolin*, *supra*, 45 Cal.4th at p. 450.) "Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal." (*Ibid.*) We assess prejudice under the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Verdugo* (2010) 50 Cal.4th 263, 280.)

The trial court did not abuse its discretion here. Contrary to appellant's assertion that the court "provided no meaningful explanation for its decision to deny the request, except to curiously conclude that this was not 'an issue on which additional time [was] really necessary,'" the court stated that it had weighed the request "against the inconvenience of having jurors come back." This was a proper consideration and a reasonable conclusion in light of the short time estimate given to the jury and the significant disruption the proposed two-week continuance would cause.

The significant burden of a mid-trial continuance was not outweighed by the benefit appellant asserted it would provide. Appellant's proposed additional investigation would at best have served to more effectively impeach Bolor. Even if the jury concluded Bolor was not credible and rejected her testimony in full as a result, it would still have before it the surveillance video

of the incident, the body-worn camera footage of the victim's description, Cullen's testimony about the description he broadcast, Cullen's testimony that appellant was arrested a short time after the incident around the corner from the crime scene, and the possibly bloodied shoes appellant was wearing at the time he was arrested. In light of this strong evidence, there is no reasonable probability the jury would have reached a verdict more favorable to appellant had the trial been continued and Bolor more thoroughly impeached. (See *People v. Watson, supra,* 46 Cal.2d at p. 836.) This is particularly true in light of the court's instruction informing the jury that it could consider the effect, if any, of the late disclosure[6] on the weight and significance to afford Bolor's testimony.

We are not persuaded otherwise by *Hughes, supra,* 50 Cal.App.5th 257. Defendant Hughes was charged with three counts of murder after he struck a car while driving drunk. "The critical issue at trial was whether Hughes's drinking was a substantial factor in causing the accident. The police and highway patrol both concluded the deceased driver was the primary cause of the accident, and their testimony suggested Hughes's speed and drinking may have played a role, but that the physical evidence suggested he was not driving at an unsafe

---

[6] The Attorney General asserts that the discovery rules were not violated—and thus the instruction was unwarranted— because the prosecutor notified appellant of the information from Bolor as soon as she received it. (See § 1054.7 [stating that discovery disclosures must be made at least 30 days prior to trial or "immediately" if information is learned within 30 days of trial].) Appellant disputes this assertion. We need not resolve the dispute.

speed and he responded appropriately in attempting to avoid the collision.  After the jury heard that testimony, however, the prosecution called as a witness a second member of the highway patrol team which investigated the accident. The expert disagreed with his colleagues and offered new expert testimony—not previously disclosed to the defense in violation of the criminal discovery statutes—that the accident wouldn't have happened if Hughes had been driving at the speed limit and hadn't been intoxicated." (*Hughes*, *supra*, 50 Cal.App.5th at p. 260.)  The trial court denied Hughes's motion for mistrial but instructed the jury on the late disclosure.  (*Ibid.*)

On appeal, Hughes argued, and the appellate court agreed, that this was "a rare case in which the trial court abused its discretion by declining to declare a mistrial." (*Hughes*, *supra*, 50 Cal.App.5th at p. 283.)  The court concluded that the prosecution "surprised defense counsel with new technical evidence on the most critical factual question relating to Hughes's guilt," on which it previously had presented only "decidedly weak" evidence.  (*Ibid.*)  The appellate court further concluded that the jury instruction was "simply inadequate," because it "did nothing to enable Hughes's defense team to test the merits of his [the expert's]  new testimony" or provide them with time to find, engage, and work with new experts "to produce a fact-based response to what turned out to be damning testimony."  (*Id.* at p. 284.)

The instant case is distinguishable from the "rare case" of *Hughes*. Bolor's claim that she had seen appellant in the area before the crime was not "new technical evidence on the most crucial factual question relating to [his] guilt."  Rather, it was straightforward lay evidence tending at best to support other

17

strong evidence—including video from a neutral source placing appellant at the scene—suggesting that appellant was the assailant. The crucial question in this case was whether appellant was the person on the video, not whether he was in the area; there was no dispute that appellant was arrested near the crime scene. Moreover, appellant requested a continuance not primarily to generate a "fact-based response" but rather to cast doubt on Bolor's credibility, which counsel's cross-examination and the jury instruction already did.

*Murphy*, *supra*, 59 Cal.2d 818, is also distinguishable. There, the defendants were charged with aiding and abetting specifically named individuals, Jim Prince and Jim McDonald, "to have and accomplish an act of sexual intercourse" with a 17-year-old girl. (*Murphy*, *supra*, 59 Cal.2d at p. 821.) On the morning of trial, however, the court granted the prosecution's request to amend the information to change "Jim Prince" to "John Doe William," and "Jim McDonald" to "John Doe Bob." (*Id.* at pp. 821-822.) The Supreme Court agreed with defendants that the belated amendments "'materially alter[ed] the entire nature of the prosecution's complaint and . . . entitle[d] the defendant[s] to adequate time in which to prepare a defense to the amended information." (*Id.* at p. 825.) The court reasoned that the amendments "did not relate to the names of the defendants themselves but to those of the particular third persons whom defendants were accused of aiding and abetting; and the latter names were not simply corrected or made more specific, but were stricken and replaced by wholly or partly fictitious names of apparently different persons. To properly prepare a defense to the charges as thus amended—which obviously allege different criminal acts—counsel for defendants might well have needed,

for example, time to consult further with his clients, time to investigate the identities of 'William' and 'Bob,' and time to produce additional evidence or interview additional witnesses for the purpose of establishing an alibi or laying the ground work [*sic*] for impeachment of the prosecution's testimony." (*Id.* at p. 827.)

Bolor's testimony did not alter the fundamental nature of the allegations or evidence against appellant. With or without the testimony, substantial evidence placed appellant in the area and inculpated him in the offense. While additional time may have improved appellant's ability to impeach Bolor, the court reasonably concluded any such benefit would be outweighed by the substantial burden of a continuance. The court accordingly did not abuse its discretion.

## DISPOSITION

The judgment is affirmed.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COLLINS, J.

We concur:

MANELLA, P. J.

CURREY, J.

19