Filed 12/10/15  P. v. Peterson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>RICHARD ANTHONY PETERSON,<br><br>     Defendant and Appellant. | F068493<br><br>(Kern Super. Ct. No. RF005983A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Thomas P. Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Rebecca Whitfield, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Richard Anthony Peterson was charged with and convicted of arson of an inhabited structure or property (Pen. Code, § 451, subd. (b)), with an enhancement for using a device designed to accelerate the fire (§ 451.1, subd. (a)(5)).[1]

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

The charges were based on a fire at the mobile home where defendant and his family lived. The fire investigators concluded defendant drilled holes above his front door, ignited the fire through those holes into the small attic, and placed two bottles of ignitable liquids in that small space to accelerate the fire. The defense conceded it was an arson fire, but attacked the fire department's investigation and failure to follow through on other leads provided by defendant, particularly defendant's contentious relationship with members of the mobile home park's association and his belief that one of his neighbors set the fire. As for the plastic bottles, defendant claimed a friend must have left them in the attic after working on a home improvement project a few years earlier, and he did not know about it.

The court denied probation and sentenced defendant to five years for arson, plus five years for the special allegation, for an aggregate term of 10 years in prison, and ordered him to pay restitution of $154,264.74 to Foremost Insurance Company.

On appeal, defendant contends the court abused its discretion when it allowed the prosecution to amend the information after the parties rested, to add an enhancement for using the plastic bottles as an acceleration device. Defendant further contends the court abused its discretion when it denied the defense request to reopen and call an expert to refute the issues raised by the enhancement. We affirm.

## FACTS

### Defendant's report prior to the fire

Defendant and his family lived in a mobile home on Saguaro Street, located in a mobile home park in Inyokern, near Ridgecrest. He lived there with his wife, four minor children, and his mother-in-law. Defendant also owned the adjacent property and other parcels in the tract.

Around 10:00 a.m. on September 17, 2009, Kern County Deputy Sheriff Justin Sawaske responded to defendant's mobile home and took the following report from him. Defendant said he received an anonymous and threatening telephone call in the middle of

2.

the previous night. Defendant also said he woke up in the middle of the same night because he heard a sound that resembled an electric pencil sharpener. Defendant said he went outside to look around and did not see anything. In the morning, however, defendant found three holes drilled in the eave above his front door. Deputy Sawaske saw the holes, and noticed fresh sawdust and wood debris below them. He took a photograph of the eave. Defendant was concerned, and believed the same person called him and drilled the holes.

**The fire**

Around 1:00 a.m. on September 29, 2009, the Kern County Fire Department responded to a fire at defendant's mobile home. When Captain Richard Reeder arrived with his unit, defendant was standing outside and spraying water on the north side of the mobile home's roof with a garden hose. Reeder thought that was odd because there was no fire coming out of the roof.

Captain Reeder testified that smoke was emerging from under the eaves, between the doors, and different cracks in the mobile home. The smoke was relatively strong, greyish-white and turning black, which meant the fire was starting to build. Reeder could not see any flames. However, there was a steady stream of smoke coming out, which meant they had very little time to get inside and attack the fire.

Captain Reeder quickly walked around the structure to survey the situation, and believed the fire started in the rear kitchen. He decided to enter through the door on the west side, but it was locked. Reeder yelled at defendant and asked for the key. Defendant was still hosing off the roof, even though there were no flames there, and he did not move from that location. Defendant told his wife to open the door. Defendant's wife produced a full ring of keys, but she could not find the right key.

Captain Reeder ordered Engineer Jacobs to break down the door. Jacobs opened the door with a sledgehammer. They entered the family room within three or four minutes after their initial arrival at the scene. There were no flames but there was heavy

3.

black smoke as high as his waist, and Reeder could not see.  Reeder fell down three or four times over several obstacles in the family room, including the furniture, tables, and boxes.

Captain Reeder used his water hose to work his way to the back of the structure.  He found heavy fire and extensive heat in the kitchen.  The upper kitchen cabinets, ceiling, and attic space were on fire.  The fire was hot and growing.  Reeder sprayed the kitchen ceiling with his water hose and "knocked down" the intensity of the fire in five or six minutes.  There were still residual flames in the structure, and it took about 40 minutes to completely extinguish the blaze.

**Discovery of the flammable liquid odor and the plastic bottles**

Firefighter Matthew Dominguez initially used a pike pole to pull down the ceiling to suppress the fire.  He was wearing his full gear.  Some water came down from the ceiling.  After about 20 minutes, he used a chainsaw to remove the hallway ceiling where the fire was located to ensure the fire was extinguished in the void space between the ceiling and the roof.  As Dominguez cut the ceiling, about a half-gallon or more of a clear fluid poured on top of him from the ceiling.  Dominguez left the structure to change his oxygen tank.  As he was changing tanks outside, he smelled the odor of gasoline from his gear.[2]

After the fire was extinguished, Captain Reeder and defendant walked through the mobile home.  Reeder smelled a flammable liquid that he thought was similar to paint thinner or some other mineral spirit.[3]  The smell was in the kitchen, the bathroom hallway, and by the front door.  It was stronger inside than on the outside.  Reeder knew

---

[2] Firefighter Dominguez had been wearing a Nomex fire-resistant protective hood when the liquid fell on him, and gave the hood to Chief Shawn Whittington as part of the arson investigation.

[3] Mineral spirits are petroleum-based liquids that are flammable or ignitable and include paint thinner and pure toluene.

that paint thinner and mineral spirits were ignitable liquids that could be used as accelerants.

As he walked around the structure, Captain Reeder testified defendant directed him to look at three holes above the front door on the north side, by the eave. Reeder had earlier seen fire and flames in the area of those holes, and defendant had been spraying water on the roof in the same area.

Fire Captain Luis Monterroso, who also responded to the scene, determined the blaze was a ceiling fire with quite a bit of smoke damage. Monterroso was familiar with the construction of mobile homes. Defendant's structure had a small attic void space between the interior ceiling and the roof which contained noncombustible insulation, similar to other mobile homes. Monterroso testified the void space was not designed for storage, but he supposed someone could place items there.

Captain Reeder advised Monterroso about the holes above the north door. Monterroso testified there were three holes drilled into the eave above the door. The holes penetrated into the void area between the ceiling and roof. In the area where the holes were drilled, Monterroso smelled flammable liquids, such as mineral spirits, a solvent, or paint thinner.

Captain Monterroso found two 1-gallon plastic bottles on the hallway floor by the bathroom. He smelled the same odor of a solvent-type, mineral spirits liquid in the bottles. Monterroso only smelled flammable liquid by the front door holes and the area where the plastic bottles were found. Engineer Jacobs was present when the bottles were found in the hallway, which was about an hour after their initial arrival at the scene.

Captain Reeder testified that paint thinner and other mineral spirits could be used as accelerants. Reeder thought defendant was acting oddly compared to other people in similar house fire situations. For example, when the fire crews arrived, defendant was spraying water on the roof, but there were no flames coming from the roof. Defendant was not excited, he did not show any emotion, and did not approach the firefighters when

5.

they arrived. He stayed in his location as he sprayed water on the roof; he did not tell them anything about the structure or interior; and the firefighters had to approach him for information. Reeder noticed defendant's family was standing next to a large amount of clothing and luggage. It did not seem as if the clothing had been gathered in haste. There were computers and game consoles in the family and dining rooms which had been covered by blankets.

Captain Reeder decided to call an arson investigator because he believed the fire was suspicious in origin. Defendant told Reeder that he was the victim of a "hate crime" and said "that people hated him and they … set the fire on the house."

**Chief Whittington's investigation**

Around 5:30 a.m., Battalion Chief Shawn Whittington of the fire department's investigative unit arrived at the mobile home. Whittington testified the structure was a rectangular, double-wide, 1971-era mobile home. It had metal sides and a flat metal roof. There was a shed-type enclosure attached to the rear which was used for storage. There was an addition to the side with an asphalt composition roof.

Captain Reeder advised Chief Whittington about the three holes drilled in the eave above the north door. Whittington testified the holes had been drilled from the outside. He noticed light charring and smoke damage around the three holes. There was also charring in the doorway's interior, which had come down from the ceiling.

Chief Whittington walked through the interior with defendant. Whittington did not smell any ignitable liquids, mineral spirits, or gasoline on defendant.

Chief Whittington testified the bulk of the damage to the structure was caused by the fire suppression efforts, which including removing the ceiling to look for the source. "The actual fire itself and the charring … was in a relatively small area."

As he walked through the structure, Chief Whittington detected a "heavy" odor of ignitable liquid, similar to mineral spirits. "It was a significantly overpowering smell of

6.

ignitable liquid … that I likened to that of mineral spirits.  It was a very overpowering … so much overpowering, it was difficult to locate the source."

Chief Whittington used a combustible gas indicator (also known as the "sniffer") to find the source of the smell.  In the midst of the ceiling debris and insulation on the floor, he saw the two plastic bottles in the hallway.  The bottles were partially melted and a vent hole had opened in each one.  He believed the bottles fell from the ceiling void while the firefighters were trying to extinguish the flames.  The bottles were empty, but the interiors appeared wet as if they had recently contained fluid.  There were partial labels on the bottle that indicated they were "paint cleanup."  The bottles were inside of a plastic shopping-type bag that smelled like mineral spirits.

After taking photographs of the bottles, Chief Whittington turned the bottles over and found slashing marks on the bottom that were "pretty consistent with the chain saw blade" cutting them open.  Whittington believed the firefighter's chainsaw cut open the bottoms of the bottles and emptied the contents while he was trying to open the ceiling.

Chief Whittington examined the ceiling and the void space above where the bottles were found.  There was smoke damage in the void space between the ceiling and the roof.  The two plastic bottles were found about 20 to 25 feet from the holes above the front door.  There were some vents in the roof but nothing that was "big enough to place those plastic containers into that void" from the outside.  There was a small vent for the bathroom exhaust fan, but it was eight to 10 feet away from the location of the bottles, and "it was not large enough to get those bottles into from the outside."

Chief Whittington testified that someone could not have placed the plastic containers into the attic void, and above the ceiling, by raising the roof or any place outside of the mobile home.  Based on the burn damage to the bottles, Whittington concluded they had contained ignitable liquids.

## Chief Whittington's opinion

Chief Whittington testified to his opinion that the fire was the result of arson. He ruled out potential accidental causes of the fire. Whittington testified the point of origin was within three feet of the area above the front door, where the three holes were.

"Q. Would you please describe the fire that you observed, the setup … as it relates to how that fire would grow based on where the fire was with the holes and the two plastic containers containing the liquid.

"A. Upon viewing evidence that I discovered …, you had an area of origin over the front door with a relatively, by all standards, low-intensity fire at that point. 25 feet away, you had plastic containers containing ignitable liquid in a plastic container that's easily failed. So you had the ability for that fire to grow at a pretty controlled rate. *But once it hit those containers, then it would grow at quite a bit significantly faster rate, and it … would enable the fire to burn at a faster rate and spread a little faster and burn the structure.*

"Q. So the setup that you saw, the device that you saw, was that a time-delayed device?

"A. My interpretation of the setup, what I saw, was that *it was a time-delay device. It was something devised to spread the fire to a faster degree at a certain point after the fire had been lit.*" (Italics added.)

Based on the manner in which the plastic bottles had burned, melted, and vent holes opened, Chief Whittington believed the bottles were at least half full when the fire began.

"[T]he liquid has a cooling effect and will stay cooler than that airspace above it. So as that airspace heats up and allows for that bottle to start deforming in its shape and starting to melt and deform down, that liquid has a more cooling effect. It has … a denser property. [¶] So from that point, based on the physical characteristics of those bottles, I can say that those bottles contained liquid to that point where it stopped, and then the [firefighters'] suppression effort was able to stop the chemical chain reaction, that is, fire and production of heat and smoke."

## The insurance claim

In September 2009, Mary McDonald (McDonald) was a branch claim supervisor for Foremost Insurance, a subsidiary of Farmers Insurance. Foremost Insurance handles

specialty insurance for mobile homes and recreational vehicles. As of December 18, 2008, defendant had a policy with Foremost Insurance insuring the mobile home which covered $270,000 for the structure, $140,265 for personal property; $54,000 for living expenses; $28,053 for adjacent structures; and $500,000 for liability coverage for bodily injury. The policy had an "intentional act" exclusion that excluded claims if the homeowner set fire to his or her own property. The homeowner would commit fraud if he or she committed arson and collected insurance proceeds.

After the fire, defendant submitted a claim on the policy. McDonald recommended the denial of his claim because of the arson investigation and the amount of the policy. However, Farmers Insurance's home office overruled her recommendation and advised her to pay the claim. McDonald testified the company would not have paid the claim if it found enough evidence of fraud.

McDonald testified defendant was paid a total of $154,264.74 on the claim, which included structural damage, personal property loss, and living expenses. This amount did not include over $10,000 for investigative fees. He received his first payment on September 30, 2009.

The prosecution introduced exhibit No. 41, a certified copy of a grant deed in the names of defendant and his wife as joint tenants, for a residential property on Stargazer Place in Palmdale, dated October 23, 2009. Defendant and his family moved to that property after the fire. McDonald testified that starting on or about December 23, 2009, the insurance payments were sent to defendant at the Palmdale residence.

**The computer evidence**

A forensic examination was conducted on an HP Pavilion Slimline computer found inside defendant's mobile home at the time of the fire. The prosecution's expert testified that at some point between August 31 and September 7, 2009, someone used this computer to visit the website www.foremost.com/news/2009/arson-school.htm. The website showed pictures of recreational vehicles and cars that were on fire. The text

9.

stated: "One key observation was how difficult it was to start a fire in an automobile or recreational vehicle without ventilation." The text also stated: "Newer models are so airtight, a fire will typically burn through its fuel and just self-extinguish," and "However, when a fire was started with an accelerant fueled by oxygen, it took less than eight minutes to start collapsing a fifth-wheel."

**Prosecution expert testimony**

Dr. Neil Spingarn, owner and manager of S&N Laboratories (S&N) in Santa Ana, and Daniel Connell (Connell), an analytical chemist with the company, testified about laboratory tests conducted on the following evidence from the fire: five samples of ceiling material from the area where the holes were drilled above the north door (item Nos. 1-5); the two empty one-gallon plastic containers found in the hallway (item No. 6); and the firefighter's Nomex hood (item No. 8). The tests were conducted in November 2009. The insurance company paid for the tests.

Connell, a gas chromatography expert, conducted the tests to detect any significant liquid residue from vapors on the items. The laboratory did not test any free liquids. Connell testified the initial tests showed "very high levels" of volatile components in the samples. Dr. Spingarn explained this meant that high levels of ignitable liquid vapors were still present. Connell smelled some sort of solvent on the Nomex hood during the tests. The test on the Nomex hood resulted in a trace amount of ignitable liquid vapor.

The gas chromatograph and mass spectrometer tests were positive for gasoline on all the items. Dr. Spingarn testified gasoline was an ignitable liquid and could be used as an accelerant.

Dr. Spingarn testified that some pieces of the front porch ceiling had higher levels of toluene than expected for gasoline. These levels could indicate the presence of another ignitable liquid. It also could have been the result of decomposition of the material during the fire, which would have burned off toluene.

Connell testified he could not exclude the presence of mineral spirits from the items. He explained gasoline and mineral spirits "share a lot of the similar components," and he could not be sure if there was something other than gasoline in the samples.

**DEFENSE EVIDENCE**

**Laboratory reports**

Dr. Andreas Gebauer, an associate professor and chair of the Department of Chemistry at California State University, Bakersfield, testified for the defense about the laboratory tests conducted by the prosecution. After the tests were conducted by S&N, Chief Whittington sent the same items to Armstrong Labs for the same tests. Dr. Gebauer testified the results from the two laboratories were "not even close to being identical" to each other. The S&N tests found gasoline while the Armstrong tests found mineral spirits.

Dr. Gebauer testified the S&N tests found a significantly higher amount of toluene in five samples. According to the report from Armstrong Labs, however, the toluene levels were "very miniscule, very, very low level." Dr. Gebauer believed the difference resulted from the failure of S&N to conduct a "blank" test between each sample. Dr. Gebauer explained that each test is conducted by using a fiber to take a sample within the containers that hold each item of evidence. When multiple samples are tested, a "blank" test in run between these samples and ensures the fiber has not been contaminated before the next test. The failure to run a "blank" test decreases the reliability of the test because there is no assurance the fiber was not contaminated by some other substance.

Dr. Gebauer testified he reviewed the S&N report and conceded gasoline was present in all the samples. He could not exclude gasoline or mineral spirits with any certainty because they were similar. "[Y]ou cannot decide either way if it is mineral spirits or gasoline…. It could have been either."

11.

**Defendant's family**

Two of defendant's children, G.P. and M.P., were 10 and 14 years old, respectfully, at the time of trial. They testified that on the night of the fire, they were asleep when they heard their father yell that there was a fire, and he made them run away. M.P. testified his grandmother was spraying a garden hose at the fire. The children testified their computers were kept on the same table in the family room before the fire. They did not know how the blankets were placed on the computers during the fire.

Mary Fernando (Fernando), defendant's mother-in-law, testified she was asleep and heard defendant yell there was a fire. Fernando testified that two months earlier, she packed two large suitcases in preparation for an upcoming trip to Sri Lanka, where she and her daughter were from. When defendant yelled about the fire, she dragged those suitcases out of the back door as she left the mobile home. Fernando and defendant's wife also grabbed laundry from the back room.

Fernando testified about an incident that occurred six to eight months before the fire, when defendant was not home. An unknown man came to the door and said he was looking for defendant. The man acted "rowdy" and Fernando was scared. Fernando told the man that defendant was not there, and the man said he would come back.

**Defense computer analysis**

William Wilson (Wilson) lived in the same mobile home park and knew defendant. Wilson was also involved in a romantic relationship with defendant's mother-in-law. Wilson testified that in August 2009, he received a letter from his insurance broker about his policy with Foremost Insurance, which advised him to change his policy to another company. Wilson researched Foremost Insurance on the Internet and read that there were disputes with the company about paying claims. Wilson knew defendant's mobile home policy was also with Foremost Insurance, and told defendant about the matter in September 2009.

Donna Meyers, a lecturer in computer science at California State University, conducted a forensic examination of defendant's computer and determined the exact path of the Internet search which led to the "arson school" site. Meyers testified that on September 3, 2009, someone searched for "Foremost Insurance problems," which led to a hyperlink to "arson school." Meyers testified that the person did not directly search for "arson" or "arson school."

## The mobile home association

Ronald Peterson lived in the same mobile home park and was the president of the homeowner's association. Ronald was not related to defendant, they were not friends, and they had multiple conflicts regarding the homeowner's association and the board. Defendant had tried and failed to join the board, and often argued with the board's decisions. Ronald testified that shortly before the fire, he was part of a decision made by the board of the homeowner's association to file a nonjudicial foreclosure lien against another property that defendant owned in the mobile home park.

## DEFENDANT'S TRIAL TESTIMONY

## Prior incidents

Defendant testified that five years before the fire, he bought bottles of "paint cleanup" for a renovation project. Defendant, his wife, and their friend, John Milam, worked on the project. The paint cleanup material was used to clean paintbrushes and stains on doorknobs. After they finished, Milam put away the bottles, and defendant did not know what happened to them. He did not know they were in the mobile home's attic.

Defendant testified he had an adversarial relationship and "run ins" with Ronald Peterson on the homeowner's association board. Defendant ran against Ronald's brother and believed members of the board had stolen money. Defendant testified that in 2006, he was working on a nearby property with John Milam when Ronald drove by and said, "I can't wait to get a son of a bitch like you out of the park." Defendant received multiple complaints and inquiries from regulatory agencies about the condition of his

13.

property which were initiated by the board; he resolved all the complaints. In 2009, Ronald drove in front of defendant's house, honked the horn, and made an obscene gesture while defendant's family was present.

**Defendant's insurance policy**

At some point prior to the fire, defendant was advised by Wilson about problems with Foremost Insurance. Wilson said their broker was changing insurance companies. Defendant testified he used the computer to investigate and found a site about "Farmers fights fraud." He clicked on the site and reached something called "arson school." Defendant closed the window because it was not what he was looking for.

**The alleged threat and discovery of the holes**

Defendant testified that on September 15 or 16, 2009, he was out of town with his wife and children. His mother-in-law, was alone in the mobile home when a strange man appeared at the door and punched the side of the house. She was frightened and called defendant, and he immediately returned home. He inspected his home and found an indentation on the wall between the light and the doorbell near the front door. On cross-examination, however, defendant testified this incident occurred three or four months before the fire.

Defendant testified that on the night of September 16, 2009, he received a threatening telephone call. Defendant did not describe the caller's voice or what the caller said. Also that night, he was asleep when he heard a sound like someone was using an electric pencil sharpener. The noise stopped and started multiple times. Defendant thought it was his children and yelled, "Go to bed" or "Go to sleep," and the noise stopped. Defendant realized the lights were out and the children were asleep. He opened the front door and looked outside, but he did not see anything.

Defendant testified that on September 17, 2009, his wife showed him there were holes above his front door. Defendant testified the three holes were each about the size

14.

of a nickel.  Defendant called the police and reported the incident.  Defendant purchased material to fill in the holes but never got around to doing the job.

**The fire**

Defendant testified that on September 29, 2009, he was asleep on the couch when he smelled smoke.  He woke up and saw smoke from the ceiling by the front door.  He panicked because of the children.  He thought his daughter was asleep in the front room and tried to find her.  She was in another room, and he screamed at everyone to get out.  His son, D.P., ran towards him, but defendant turned him around and told him to get out.

Defendant testified the computers were on a table in the front room.  He grabbed a quilt he had been using on the couch, and another blanket, and threw them over the computers.  He retrieved two fire extinguishers from outside, returned inside, and saw smoke.  He opened the attic access and sprayed the extinguisher into the area.  As he used the second extinguisher, the smoke became intense, and he had to get out.

Defendant testified his wife and mother-in-law dragged a large suitcase out of the mobile home.  Defendant grabbed some laundry and told them to get out.  Defendant also got out and called 911.  He grabbed the hose and sprayed water at the front door, near the area of the three holes.

Defendant testified he showed the firefighters the three holes above his front door.  He told Captain Reeder that he was the victim of vandalism and thought it was an arson fire.

Defendant testified he was present when Chief Whittington found the two plastic bottles, but described a different version of the event.  Defendant testified he provided a stepladder, which Whittington used to look into the attic space.  Whittington removed the two plastic bottles from that area.  Defendant testified this was the first time he saw the bottles.

At some point after the fire, defendant looked into that same attic area and found a partially burned and melted videotape.  Defendant testified that based on the box, it was

15.

an old Japanese "pornographic" video. Defendant showed the tape to Chief Whittington, and a photograph of it was introduced into evidence.

Defendant testified there was tension between him and Chief Whittington over his investigation of the fire. Defendant told Whittington about the threatening phone calls, the suspicious incidents before the fire, and his conflicts with the mobile home association. Defendant testified to his belief that Ronald Peterson started the fire to kill defendant and distract attention from the lien that the board filed against him. Defendant was upset about Whittington's failure to follow any of these leads. He wrote two letters of complaint about Whittington, which he sent to Fire Chief Chris Angello and the district attorney's office.

Defendant testified he used the insurance money to pay for his family's living expenses after the fire. The insurance proceeds did not cover the amount of the loss. They initially lived in a hotel, and then moved into the residence that he owned next to the damaged mobile home. They had to move out because his daughter was sensitive to the smoke and smell from the damaged structure. Defendant testified he bought a property in Palmdale for $230,000. The deed of trust was dated October 23, 2009, but defendant testified that date was wrong because the sale closed on November 6, 2009. Defendant testified the Palmdale residence had not been listed for sale before the fire, and he had no knowledge of it until after the fire.

**Rebuttal**

Daniel Connell of S&N Laboratory was recalled to address the testing methods. Connell testified he ran a "system blank" and then a "fiber blank" before he tested any samples in this case. After he tested item No. 1, a part of the ceiling, he ran another fiber blank since the first test showed high levels of volatiles. "[W]e wanted to check to make sure the fiber was clean after that run, and it showed that it was clean." He conducted another fiber blank with the next run, and then tested item Nos. 2 and 3, which were also part of the ceiling. Connell did not conduct a blank test between item Nos. 2 and 3

16.

because the levels for item No. 2 were "quite a bit lower than for item No. 1," and it was reasonable to conclude there would not be any "carry-over." Instead, Cornell went through an extra cleaning process after testing item Nos. 2 and 3 by heating the fiber "to get all the volatile to evaporate off the fiber. Then the fiber is removed, and then it is placed into another [gas chronometer] … and it is allowed to just sit in a hot injection port to clean" for 20 or 30 minutes. Connell conducted the cleaning process with "every run."

Connell testified that after he tested item No. 4, another part of the ceiling, he conducted another blank test because of high levels of volatiles in item No. 4. When he tested item No. 5, the final piece of ceiling, it also had high levels, and he conducted another blank test. "When you see something high, we always just double-check the blanks to make sure the system is clean before we move on to try to safeguard from any kind of crossover contamination."

**Arguments, verdict, and sentence**

The prosecution theory was that defendant staged the fire for financial gain by reading about arson techniques on the Internet, drilling the holes above the front door, then falsely reporting an act of vandalism, and placing the plastic bottles with an ignitable fluid in the attic space to act as an accelerant.

The defense theory was that his handyman left the two bottles of paint cleanup in the ceiling after defendant's renovation project but without his knowledge, and an unknown arsonist drilled the three holes and started the fire. Defense counsel attacked Chief Whittington's investigation and his failure to follow up other leads, particularly about defendant's hostile neighbors. Counsel argued that Whittington decided defendant was responsible and only looked for evidence to support that conclusion.

Defendant was convicted of arson and the jury found the special allegation true. He was sentenced to five years for arson and five years for the special allegation.

17.

## DISCUSSION

### I.  The Court's Rulings on the Motions to Amend and Reopen

After both parties rested in this case, the prosecution moved to amend the information to conform to proof and add an enhancement to the arson count, that defendant used a device designed to accelerate the fire, based on the presence of the two plastic bottles of ignitable fluid in the attic (§ 451.1, subd. (a)(5)).  The court granted the motion over defense counsel's objections.  Defense counsel then moved to reopen his case to determine whether to call an expert to refute the new enhancement.  The court denied the motion.

Defendant contends the court abused its discretion when it granted the prosecution's motion to add the enhancement, and denied his motion to reopen to call another expert to address the issues raised by that enhancement.

#### A.  Motions to Amend and Continue

We begin with the well-settled law in this area.  "The general framework within which criminal pleadings are amended is statutorily derived and has remained constant since 1911.  [Citation.]  Section 1009 authorizes amendment of an information *at any stage of the proceedings provided the amendment does not change the offense charged in the original information to one not shown by the evidence taken at the preliminary examination*.  If the substantial rights of the defendant would be prejudiced by the amendment, a reasonable postponement not longer than the ends of justice require may be granted.  The questions of whether the prosecution should be permitted to amend the information and whether continuance in a given case should be granted are matters within the sound discretion of the trial court and its ruling will not be disturbed on appeal absent a clear abuse of discretion.  Moreover, a trial court correctly exercises its discretion by allowing an amendment of an information to properly state the offense at the conclusion of the trial.  Similarly, where the amendment makes no substantial change in the offense charged and requires no additional preparation or evidence to meet the change, the denial

18.

of a continuance is justified and proper.  [Citations.]"  (*People v. Winters* (1990) 221 Cal.App.3d 997, 1005 (*Winters*), italics added; *People v. Burnett* (1999) 71 Cal.App.4th 151, 165; *People v. Arevalo-Iraheta* (2011) 193 Cal.App.4th 1574, 1580–1581.)

We now turn to the procedural history of this case, particularly about whether there was evidence at the preliminary hearing that plastic bottles contained ignitable fluids and were acceleration devices.

### B.  <u>Preliminary Hearing</u>

The fire occurred on September 29, 2009.  On January 6, 2011, a felony complaint was filed charging defendant with arson and four counts of child endangerment for setting the fire while his minor children were in the mobile home.

On May 26 and 27, 2011, the court conducted the preliminary hearing.  Then-Captain Whittington was the only witness, and his testimony was very similar to what he later testified at trial.

At the preliminary hearing, Chief Whittington testified about the three holes drilled above the door and that he smelled mineral spirits by the door.  He testified that Firefighter Dominguez used the chain saw on the ceiling, that two plastic bottles were discovered on the hallway floor, that the bottoms of the bottles had been cut open by the chain saw, that the bottles were empty, were burned and partially melted, which was consistent with liquid being inside. He further testified that he smelled mineral spirits from the bottles, and the bottles were about 25 feet away from the door where he smelled the same odor.

Chief Whittington testified the partially burned label on the bottles identified the contents as paint cleanup; and the laboratory tests on the bottles and the ceiling samples from the front door were positive for gasoline.

Chief Whittington testified that in his opinion, regardless of who was responsible for starting the fire, the fire's point of origin was the holes above the door.  The plastic bottles were 25 feet away from the holes.  The heat generated from the fire would have

19.

been enough to melt the two plastic bottles given the narrow depth of the attic space. Given the location of the fire, the bottles were moments away from being fully ignited when the firefighters extinguished the blaze. Whittington further testified to his opinion:

> "[T]he holes were intentionally drilled for the purpose of starting the fire, and that *the containers with the ignitable liquid in them were staged for the purpose of carrying the fire*." (Italics added.)

Chief Whittington testified that the contents of the bottles were used as an accelerant.

> "Q.    And absent this introduction of mineral spirits where you found them in the insulation area, *absent any introduction of that accelerant, would any attempt to light a fire at the holes find its way to the Paint Cleanup bottles*?
>
> "[A.]  *No.*
>
> "Q.    Was there any access that you could discern from inside the house that would otherwise permit somebody to place the mineral spirits in the area of the insulation that you found it?
>
> "A.    No." (Italics added.)

Chief Whittington also testified about the forensic examination of defendant's computer: A site about the arson school which Foremost Insurance conducts for its investigators had been visited, and the site discussed "the need for adequate ventilation with accelerants" to burn a recreational vehicle. Whittington testified recreational vehicles were constructed in the same manner as early-model mobile homes.

The court held defendant to answer on the arson count. The court dismissed the child endangerment charges because the prosecution failed to present evidence on the children's precise ages.

On June 8, 2011, the information was filed which charged defendant with arson of an inhabited structure or property; it did not allege any enhancements.

### C. **The First Trial**

On November 2, 2012, defendant's first trial began with motions in limine. On November 13, 2012, the presentation of evidence to the jury began. The instant record does not contain the reporter's transcript for the first trial. According to the minute orders, the testifying witnesses were Captains Reeder and Monterosso; Firefighters Dominguez and Jacobs; Deputy Sawaske; Chief Whittington; Dr. Spingarn and Connell.

As the trial progressed, defendant's public defender became ill, and the trial was continued for several days. On November 26, 2012, the court declared a mistrial because of defense counsel's illness and unavailability, and the jury was excused.

### D. **The Second Trial**

On October 8, 2013, defendant's second jury trial began with motions in limine. On October 11, 2013, the presentation of evidence to the jury began. As set forth in the factual statement above, Chief Whittington testified consistent with his preliminary hearing testimony, and in greater detail, about his opinion that the fire's point of origin was the three holes, the two plastic bottles contained ignitable liquids, and the fire was set to use the contents of the bottles as an accelerant for the fire.

### E. **The Prosecution's Motion to Amend**

Defendant's appellate contentions are based on the following sequence.

On October 22, 2013, after both parties rested, and before the jury was instructed, the court conducted the instructional conference in chambers. When the matter resumed on the record, the prosecutor moved to amend the information to conform to proof and add an enhancement to the arson charge, that defendant used a device designed to accelerate the fire (§ 451.1, subd. (a)(5)). The prosecutor argued:

> "The evidence in this case presented whoever lit the fire did use this accelerant device to fuel the fire. It is an enhancement. The evidence was presented, argued by both counsel, presented. And defense also presented defenses to dispute that evidence."

21.

The court asked the prosecutor whether there were any discovery issues, and if one could argue "that discovery was never provided involving an accelerant in this case." The prosecutor replied that the investigative and laboratory reports were provided to the defense "upon the initial filing years ago."

Defense counsel objected to the prosecution's motion to amend as "highly unusual."

> "In this particular case, the defense had spoken with an expert, a William Crisp out of LA, and had this enhancement … been added prior to trial or at least after the People's case-in-chief, we would have had an opportunity to call him in regards. He is an arson expert. I believe that allowing the prosecution to amend and add now would be highly prejudicial.

> "The People have had this case, this fire since 2009. As indicated by [the prosecutor], the testimony of Whittington regarding this device was presented at the preliminary hearing, was presented at the original trial, and at no time did they seek to amend and add.

> "If they had added this enhancement prior to the trial or at least during the trial, one, it may have affected the negotiation on whether or not [defendant] wanted to offer a counteroffer; and, two, it may have affected how we presented our evidence.

> "To seek to amend and add after the close of evidence, I think, would be highly prejudicial to [defendant], and we are objecting."

The court asked defense counsel if she agreed with the prosecutor, "that the defense has been on notice involving the accelerant or the delaying device…. In other words, is there no discovery issue because the defense had this information certainly well before this trial began; and, therefore, it has not caught the defense off guard in that they had no idea this evidence existed?"

Defense counsel agreed "there's no discovery issue" but argued the defense was caught "off guard" by the proposed amendment.

> "[T]he People have had, since the filing of this, since the mistrial, more than enough time to amend and add this particular enhancement if they

chose to. *It just would have shaped the evidence differently had we been given notice that they intended to amend.*" (Italics added.)

The court asked the prosecutor whether information about the accelerant was presented at the preliminary hearing. The prosecutor reviewed the preliminary hearing transcript and noted that Chief Whittington testified he smelled an ignitable liquid, the plastic bottles were melted, they smelled of mineral spirits, they were 25 feet away from the door, the test results for the bottles showed gasoline, and the same smell was at the door.

The court granted the prosecutor's motion to amend to add the enhancement pursuant to section 1009.

> "To the extent that the defense may have been prejudiced by this enhancement simply because they were not aware the People would move to amend the Information to conform to proof that's been presented to this case, while that is a factor, it is not a significant factor in this court's opinion. What is significant is whether there's been prior notice of evidence existing either through typical discovery procedures or through a preliminary hearing. *And in this particular case, there is evidence both through discovery procedures involving the S&N Lab reports, in addition to the probable cause declaration that was utilized to question Chief Whittington, in addition to the testimony at the preliminary hearing.*

> "For those reasons, it does not appear that this is an issue that would rise to the level of any discovery violations. It is the exact opposite in that the People have provided discovery of these—of this particular area to the extent that it would apply to an enhancement for the substantive charge." (Italics added.)

### F.  **Defendant's Motion to Continue and Reopen**

Immediately after the court granted the motion to amend, defense counsel requested a "brief continuance" and leave to reopen. "I would like to speak with my expert Mr. Crisp and see what, if anything, he would say in relation to the time-delay technique. Without having given prior notice, as I indicated, I would have potentially called him had I known the People were going to amend and add this. I would ask for a continuance in order to do that, Your Honor."

23.

The court denied defendant's motion to continue and reopen without further comment.

### G. The Motion to Amend was Properly Granted

Based on this sequence, defendant argues the court abused its discretion when it granted the prosecutor's motion to amend the information to add the enhancement, and then denied his motion to continue and reopen to call another defense arson expert.

As explained above, the court may allow amendment of an accusatory pleading at any time up to and including the close of trial so long as there is no prejudice to the defendant. (§ 1009; *People v. Graff* (2009) 170 Cal.App.4th 345, 361.) An indictment or accusation, however, "cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination." (§ 1009.) " '[A]t a minimum, a defendant must be prepared to defend against all offenses of the kind alleged in the information as are shown by evidence at the preliminary hearing to have occurred within the timeframe pleaded in the information.' [Citations.]" (*People v. Jones* (1990) 51 Cal.3d 294, 317.)

We first note the proposed amendment was an enhancement pursuant to section 451.1, subdivision (a)(5), which provides that any person convicted of felony arson shall receive an additional term of three, four, or five years if "the arson was caused by use of a device designed to accelerate the fire or delay ignition." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 584, italics in original.) This statute was enacted in 1994 to increase penalties for " ' "the worst arsonists who exhibit a specific intent to inflict damage or who in fact inflict serious damage …." ' " (*Id*. at p. 586.) A " 'device designed to accelerate the fire' [citation] means a piece of equipment or a mechanism intended, or devised, to hasten or increase the progress of the fire." (*Id*. at p. 587.) The defendant's use of a "Molotov cocktail" or breaking a bottle of gasoline constitutes such a device. (*Ibid*.) In addition, the defendant's use of gasoline to fuel a fire, "no matter how it is contained or dispersed," also satisfies the enhancement. (*People v. Kurtenbach* (2012)

204 Cal.App.4th 1264, 1280.) "Because gasoline is used in connection with an arson to increase the strength and destructive power of the fire, it is consistent with the legislative intent to view the use of gasoline in connection with an arson as the use of a device designed to accelerate a fire within the meaning of the sentencing enhancement." (*Ibid.*) "As the use of gasoline in connection with an arson exhibits 'a specific intent to inflict damage' [citation] and is comparable to the use of lighter fluid to fuel a fire, we conclude based on the legislative history of section 451.1, subdivision (a)(5) that the act of pouring gasoline in a structure in connection with an arson is the 'use of a device designed to accelerate the fire' within the meaning of section 451.1, subdivision (a)(5)." (*Ibid.*)

As discussed above, defendant had a two-day preliminary hearing, which gave him notice of "the time, place, and circumstances" of factual and legal basis for the prosecution's theory that the plastic bottles and their contents were acceleration devices, as alleged in the subsequent amendment, which "is the touchstone of due process notice to a defendant. [Citation.]" (*People v. Jeff* (1988) 204 Cal.App.3d 309, 342.)[4] As required by section 1009, Chief Whittington's testimony at the preliminary hearing made defendant well aware that the prosecution's theory of guilt implicated his alleged use of an accelerant: the fire's point of origin was the three holes drilled into the eave above the north door, the plastic bottles were placed in the small attic void space, the laboratory reports stated they contained ignitable fluids, the plastic bottles were moments away from being fully ignited, the bottles were used as accelerants, they were "staged for the purpose of carrying the fire" through the attic space and the structure, and a fire ignited at the three holes would not have reached further into the structure without the use of the bottles as the accelerant.

---

[4] Defendant's case is clearly inapposite to the circumstances in *Winters*, which held the trial court should not have granted the amendment because the defendant waived his right to a preliminary hearing, and section 1009 "specifically proscribes amending an information to charge an offense not shown by the evidence taken at the preliminary hearing." (*Winters*, *supra*, 221 Cal.App.3d at p. 1007; *People v. Peyton* (2009) 176 Cal.App.4th 642, 654–659.)

The court did not abuse its discretion when it granted the amendment because the prosecution's trial theory was virtually identical to the case presented at the preliminary hearing. Indeed, defendant's trial tactics reflected knowledge of the prosecution's theory and the evidence being presented. The defense theory was that defendant's handyman must have left the two bottles in the attic crawl space years earlier, and defendant did not know anything about it until the fire. However, defense counsel also attacked the prosecution's evidence about the contents of the bottles, how they were discovered, the condition of the bottles, the contents, and whether they would have accelerated the fire. Counsel extensively cross-examined the two experts from S&N Laboratories about the tests conducted on the bottles and the other evidence seized from the structure, and called a defense expert to challenge the accuracy of S&N's testing procedures.

## H. The Court Properly Denied the Motion to Continue

We similarly conclude the court did not abuse its discretion when it denied defendant's subsequent motion to continue and reopen. "A continuance will be granted for good cause [citation], and the trial court has broad discretion to grant or deny the request. [Citations.] In determining whether a denial was so arbitrary as to deny due process, the appellate court looks to the circumstances of each case and to the reasons presented for the request. [Citations.] One factor to consider is whether a continuance would be useful. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 1012–1013, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Where the court properly grants an amendment to the information, and "the amendment makes no substantial change in the offense charged and requires no additional preparation or evidence to meet the change, the denial of a continuance is justified and proper. [Citations.]" (*Winters*, *supra*, 221 Cal.App.3d at p. 1005.) Such is the case here. As we have explained, the defense was well aware of the evidence in support of the prosecution's theory that the plastic bottles contained ignitable liquids, and the bottles were placed in the attic space, to fuel the fire started in the holes above the

north door.  Defense counsel conceded there were no discovery issues.  Indeed, the prosecution's theory was set forth in the investigative reports, the laboratory reports, the preliminary hearing, and presumably through the testimony of Chief Whittington and the other firefighters at defendant's first trial.

Defendant relies on *People v. Murphy* (1963) 59 Cal.2d 818 (*Murphy*) and asserts an information may be amended at a late stage only to correct a clerical or typographical error, which "rarely if ever are a surprise to the defendant."  Defendant argues the court must grant a continuance to allow the preparation of a defense when a late amendment is one of "substance" and involves a new allegation which must be proved beyond a reasonable doubt and carries an additional term of imprisonment.  Defendant concludes the court abused its discretion under *Murphy* when it denied the continuance because the defense never had the opportunity to further investigate or present an affirmative defense to the accelerant enhancement, or cross-examine the prosecution witnesses on the new issue.

Defendant's reliance on *Murphy* is misplaced.  In that case, the trial court granted the prosecution's motion to amend and add new charges, and denied the defendant's request for a continuance.  (*Murphy*, *supra*, 59 Cal.2d 818.)  *Murphy* held that while section 1009 vests the trial court with discretion whether to grant a continuance upon an amended pleading, "that discretion may not be exercised in such a manner as to deprive the defendant of a reasonable opportunity to prepare his defense."  (*Murphy*, *supra*, at p. 825.)  *Murphy* held the defendant's substantial rights were violated by both the amendment and the denial of the continuance, because the amendments were not supported by the preliminary hearing testimony and amounted to new charges.  (*Id*. at pp. 826–827.)  "The mere mention at the preliminary of some event not charged as an offense can scarcely be held to put a person on notice that he must be prepared to instantly go to trial on an information which substitutes the casually mentioned event for

the offense which had been charged.  [T]he transcript of the preliminary examination is devoid of evidence to support the charge … as thus amended .…"  (*Id*. at p. 826.)

*Murphy's* holding is not applicable to this case, where there was a two-day preliminary hearing addressing the same issue implicated by the enhancement, and the defense to the enhancement would have been the same as the defense already raised at trial to the arson charge.

In addition, an amendment that exposes a defendant to increased criminal liability does not offend due process.  Rather, the relevant inquiry is whether the amendment is supported by evidence at the preliminary hearing.  (§ 1009; *People v. Arevalo–Iraheta, supra,* 193 Cal.App.4th at p. 1581.)  We have already demonstrated that point.  When defense counsel moved for the continuance, she said that she needed time to consult an arson expert in Los Angeles.  Counsel stated she had previously consulted that expert, but never called him to testify even though the prosecution's theory was that defendant intentionally set up the acceleration device in the attic.  The defense theory was that one of defendant's neighbors started the fire because of his disputes with the homeowners' association, the culprit was responsible for the three holes mysteriously drilled above his door, and the plastic bottles just happened to have been stored in the small attic space for several years when the fire was started.  Defense counsel ably cross-examined Chief Whittington about the nature and circumstances of his investigation, and his alleged failure to check the leads suggested by defendant, primarily the animosity from his neighbors in the mobile home tract.  Defense counsel also called defense experts to attack the reliability of the laboratory tests performed on the plastic bottles and ceiling samples, and the forensic search of defendant's computer.  Defense counsel relied on this evidence to assert that defendant was not responsible for the fire, someone else was the arsonist, and the bottles happened to have been stored in the attic space without his knowledge.

Defendant failed to show how the defense case would have been different or needed additional witnesses in response to the well-known evidentiary support for the

accelerant enhancement. We thus conclude the court did not abuse its discretion when it granted the prosecution's motion to amend and added the enhancement, and denied defendant's motion to continue and reopen.

## II. Defendant's Requests to Discharge his Appellate Counsel

In the course of these proceedings, defendant has filed numerous motions, pleadings, and letters seeking to discharge the attorney who was appointed by this court to represent him in this appeal. He has declared that his appointed appellate counsel is ineffective, and repeatedly expressed his frustration with this court's failure to comply with his demands to discharge counsel and appoint another appellate attorney.

"Under California law a criminal defendant has neither a constitutional nor statutory right to argue his case on appeal, or to be present during such proceedings. [Citations.] [¶] Moreover, under some circumstances, counsel may be appointed on appeal over the defendant's objections. [Citations.] Once appointed, the attorney has the exclusive right to appear and control court proceedings as long as fundamental rights are not denied; neither the party himself nor another attorney can be recognized in the conduct or disposition of the case. [Citations.]" (*In re Walker* (1976) 56 Cal.App.3d 225, 228; *People v. Scott* (1998) 64 Cal.App.4th 550, 556–560.) The attorney is the "captain of the ship" in deciding which legal issues should be raised (*In re Horton* (1991) 54 Cal.3d 82, 95; *People v. Freeman* (1994) 8 Cal.4th 450, 509) and appellate counsel has no obligation to raise frivolous issues at his client's behest (*Smith v. Robbins* (2000) 528 U.S. 259, 278; Rules Prof. Conduct, rule 3–200(B)).

Defendant has asserted his appointed appellate counsel's representation has been prejudicially ineffective. A claim of ineffective assistance of appellate counsel requires a showing of both deficient performance and prejudice. (*In re Reno* (2012) 55 Cal.4th 428, 488.) Such a claim may be raised by an indigent defendant represented by appointed counsel, and if the appellate court agrees that the appellate attorney failed to raise significant meritorious issues, the defendant may be entitled to appointment of new

counsel on appeal. (*People v. Lang* (1974) 11 Cal.3d 134, 139, 142; *People v. Rhoden* (1972) 6 Cal.3d 519, 529.)

Based on a review of defendant's pleadings, the record, and appellate counsel's brief, there is no basis in this record to support his ineffective assistance claim at this time. Defendant is already well-aware of the habeas process, and if he wishes to challenge the performance of his appellate attorney as ineffective, based on matters outside the appellate record, the proper vehicle would be a petition for writ of habeas corpus. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267; *People v. Salcido* (2008) 44 Cal.4th 93, 172.)

## DISPOSITION

The judgment is affirmed.

_____
POOCHIGIAN, Acting P.J.

WE CONCUR:

_____
FRANSON, J.

_____
SMITH, J.